### THE CLARITA AND THE CLARA.

1. The owners of a vessel in flames towed by a tug and no longer in command of her own captain and crew, are not liable for injury done by her to another vessel, by the negligence of the captain of the tug; the said owners not having employed the tug, she being a tug whose regular business was the assistance of vessels in distress, and she having gone, of her own motion, to the extinguishment of the fire in this case.

2. A vessel anchored in the Hudson, opposite to the Hoboken wharves, if anchored three hundred and fifty yards from their river front, is anchored so far from shore that in case of a collision with a vessel towed in flames out of the Hoboken docks, no allegation can be made that she is anchored too near the shore.

3. A vessel at anchor having an anchor light and one man on deck, though not strictly an anchor-watch, is guilty of no fault in not being better lighted or watched. .

4. A vessel whose business it is to give relief to vessels on fire is bound to have chain hawsers or chain attachments on board, and if having only manilla hawsers she is compelled to tow a vessel out of its dock with such a hawser, which is burnt, so that the vessel on fire gets loose from the tug, and, drifting, sets fire to another vessel, the tug is liable for the damages caused.

5. The owners of a vessel who through their own carelessness (or that of their captain) set fire to another vessel, cannot claim salvage for putting that fire out.

APPEALS from the Circuit Court for the Southern District of New York; the case being thus:

A company in New York, called the New York Harbor Protection Company, and whose business was the aiding,

protecting, and saving vessels in the port of New York, when wrecked or in distress—including the rendering of aid, protection, and safety to such vessels on fire or threatened with conflagration—was the owner of a steam-tug called the Clarita. This tug was equipped, not only with means suited to assist vessels wrecked or in distress, generally, but with special apparatus for extinguishing fires, that is to say with powerful pumps and hose, worked by steam as fire-engines, also with axes and instruments for scuttling. The commander, too, was skilled in the use of such apparatus as well as in the ordinary management of a vessel in seasons of storm and occasions of distress from casualty and weather.

The dock of the vessel was at the foot of Canal Street, New York, where she was kept in constant readiness for service, with a crew on board, with fires " banked," so that at any time she could be set in motion and brought into service.

She was in her dock and in this state on the evening of the 1st of August, 1870, having on board several hempen hawsers strong enough to tow the largest vessels, but not having any hawser of chain, nor a chain attachment for a rope hawser. Hempen hawsers, as was proved, are the sort of hawser universally used in the port of New York for towing vessels heavily laden or disabled, and much preferable, *in such cases*, to chain cable. The only chains which the tug had on board were her anchor-chains, of from fifty to seventy fathoms long, down in the locker; very heavy chains, too heavy, indeed, to be handled in any sudden emergency.

Though constantly called on for assistance in cases of collision, springing of leaks, wreck, and other catastrophes arising from bad navigation, weather, or want of seaworthiness, and sometimes to extinguish fires before they had got much headway, the Clarita had never, in five years, been called on to *tow* more than one vessel in a state of conflagration, or one about to become in that state.

With this history, and in this state of things, on the evening aforesaid, and while the tug was in her dock at the foot

of Canal Street, New York, her captain espied a smoke which indicated a fire, rising apparently out of the water's edge, at Hoboken, on the Jersey shore, opposite. He got steam up on his tug at once, and was shortly at the Christopher Street slip, Hoboken, from which the smoke was ascending. He here found that a ferry-boat of the Hoboken Ferry Company was on fire; the fire, however, being in her hold, and not yet having burst forth anywhere into flame. Numerous people were on or about her, assisting to put out the fire. A Hoboken fire company was doing what it could, and two other steamers in or near the dock were sending water into her from their hose. The tug having made herself fast to the ferry-boat by one of her hempen hawsers got to work and plied her engines vigorously. A gas-tank belonging to the ferry company, which, of course, was particularly liable to ignite and explode, was near by; the dock had numerous vessels in it, and there were houses close to the place which, if a conflagration took place in the dock, would perhaps take fire and be consumed. The tug worked diligently for an hour and more, but the fire being in the hold, which was filled with flame and smoke, and therefore could not be entered so as to direct the water advantageously, gained upon the most active and persistent efforts, and it was soon discovered that it had reached the deck over the hold and was ascending to the joiner-work, of which the cabins and wheel-house, and other light wood-work on deck were composed. The master of the burning ferry-boat, who, with the chief of the Hoboken fire department, was on board of her, now requested the captain of the tug to pull the ferry-boat out of the slip and tow her on to Hoboken Flats, which were the nearest flats, and not far off. The captain of the tug hereupon, and within five minutes, attached the hawser, by which on arriving the tug had been made fast to the ferry-boat, to an iron cleat on the bow of the ferry-boat, and the tug (with the master of the ferry-boat and men of the Hoboken fire department on board), backed out of the ferry-slip and then went ahead.

Although, as already stated, the steam-tug had no chain

cable (other than unwieldy anchor chain) or chain attachment on board, it appeared by testimony given in the case that there was a light chain cable on a boat in the dock which had been assisting in putting out the fire. After the ferry-boat had been hauled about two hundred yards out of the slip, the flames burst out fore and aft and burned the hawser off, and the ferry-boat was drifted by the tide foul of a bark on the Hoboken side of the river, above the ferry slip, at anchor, before the men on the tug could get hold of her again, and set fire to the bark.

As soon as practicable, another hawser (hempen) was got to the ferry-boat, and she was hauled off from the bark.

With this second hawser the ferry-boat was got round, heading up the river, when this hawser, too, parted, from being burned off by the fire on the ferry-boat. Then, as soon as it could be done, a third hawser (this time a large hawser of seven inches) was taken to the ferry-boat in a life-boat belonging to the ferry-boat and by men from the ferry-boat and the Hoboken fire department, and was again attached to the ferry-boat. But this hawser, too, was burned off. The iron cleat to which these different hawsers had been attached remained standing in the boat.

On this third parting of the hawser which had been attached to the burning ferry-boat, every effort was made to get a line to her again as soon as possible, but before one was got to her she had drifted broadside upon the bows of a schooner, The Clara, at anchor in the river, with a proper anchor-light, but with all her men except one, who happened to be up and walking about, asleep below, and set fire to her fore-rigging, sails, and bowsprit. The place where the schooner lay anchored was about three hundred and fifty yards from the front of the Hoboken wharves. The ferry-boat, which was 164 feet long, came midship on the bows. The tug soon hauled up by the schooner and sent and attached the hawser again, and for a fourth time, to the burning ferry-boat. This time it was not burned off, and the tug, plying all her force, dragged the burning boat from the schooner away into the deep stream, where the hawser was

cut and the half-consumed remains of the ferry-boat allowed to sink.

As soon as the hawser was cut, the tug returned to the schooner, which was now burning fiercely, and certain, unless aid came to arrest the flames, to be consumed entirely. The tug made fast to her, and after having plied her engines for two hours and more succeeded in extinguishing the flames.

The owner of the schooner, thus saved from entire destruction, now filed a libel against the tug, to recover damages for the injury which she, the schooner, had suffered from the fire.

The owners of the tug in turn filed a libel against the schooner, for salvage, as having saved her from being burnt up entirely.

The case was heard upon the cross-libels.

The owners of the schooner contended that the tug was guilty of negligence, in not having had and used a chain hawser. The owners of the tug alleged that their hawser was good enough, and that the catastrophe was an inevitable accident, and moreover that the schooner was to blame in not having had an anchor-watch, who would have seen the burning vessel drifting on her and would have got out of her way. The District Court was of the opinion—

(1.) That the attempt to tow the burning ferry-boat out into the stream by a *hempen* hawser was an act of negligence.

(2.) That the drifting of the ferry-boat was not an inevitable accident, but was the result of negligence on the part of those in charge of the steam-tug.

(3.) That the schooner, not being required by law to keep a watch under the circumstances, was without fault, and entitled to damages.

That court accordingly gave to the owners of the schooner damages compensatory of the partial destruction which she had suffered by being set on fire by the drifting and burning ferry-boat. And after such a decree dismissed, of course, and from necessity, the libel of the tug for salvage, in preventing her being burned as to her residue.

· The Circuit Court on appeals confirmed the decrees, and from the decrees of the latter court these appeals were taken by the owners of the tug.

*Mr. Van Santvoord, for the appellants:*

The questions in the two appeals arise upon the same facts; and the question whether the owners of the tug are entitled to salvage for saving the schooner from being wholly consumed, depends wholly on the question whether the tug wrongfully caused the schooner to be˙set on fire in the first instance. If she did not cause her so to be set on fire at all, a claim for putting out the fire is a just one. If the tug did wrongfully cause the schooner to be set on fire, a claim by the tug for putting out the fire which she herself wrongfully caused would be preposterous. We should not present it.

We confine ourselves, therefore, to the only question in either case, whether the tug wrongfully caused the schooner to be set on fire:

1. We say that she did not. It might be argued with a certain plausibility that all that was done here by the captain of the tug, was done under order of the master of the ferry-boat. The tug was a vessel of New York, and · when she went into the docks of Hoboken, she put herself under the authorities there. Both the master of the Hoboken ferry-boat and the engineer of the Hoboken fire department were aboard of the tug when she was drawing the burning ferry-boat out into the stream, and it was *their* men who carried the hempen hawser to the schooner at anchor.

2. It might be argued too with a certain plausibility that the schooner was not anchored in a proper place, just in face of the wharves of the Hoboken ferry.

3. We might assert with more confidence that the absence of a proper "anchor-watch" should bar the schooner's claim, or, at least, and if the tug be found in fault, cause an apportionment of the damages.* A considerable time elapsed from the time that the hawser was burnt on the third occa-

---

* The Sapphire, 11 Wallace, 164; The Indiana, Abbott's Admiralty Report, 330, 335; Clapp *v.* Young, 6 Law Reporter, 111.

sion till the burning ferry-boat ran afoul of the schooner. Had there been an anchor-watch he could have sheered, by means of the wheel, and slipped his chain, when the schooner would have drifted, and the catastrophe would have been avoided.   But none of these arguments are pressed by us, much stronger ones remaining.

4. Admitting that *if* anything was wrongfully done by any one in the case, the tug was responsible for it all, we assert that nothing was done wrong by any one; that the case was one of misfortune, or, as it may be equally well called, of inevitable accident.

It is to be observed in the first place that it is the interest of shipping that an enterprising company, like the one which owned this tug—a company which, at great expense, fits up a tug with powerful steam-pumps, and keeps the vessel ready with her fires banked, night and day, to move on a moment's notice everywhere about a harbor for useful service—should be encouraged.   If in a great and sudden emergency it have not done everything which on a retrospect, coolly made after the event, may appear to have been the best thing, it should not be dealt with hardly.*

Now, it is in evidence that such an occurrence as having to tow a vessel in flames was a very rare one, though extinguishing fires while they are in dock or at anchor may not be so uncommon a one; and that Manilla hawsers are the only hawsers in use in towing vessels.   It is plain too on ascertaining that the fire could not be got under by the fire engines and pumps—the fire gaining upon these efforts, the flames having already broke out under the guards and reached her joiner work—that the only means of saving the ferry-boat and preventing the spread of the conflagration to the wharves and adjacent buildings and other property, was an *immediate* removal of her out of the slip, with a view, if possible, of beaching her on the nearest flat; it not being possible from the condition of her deck to bring her to

---

* Nield *v.* London and Northwestern Railway Company, Law Reports, 10 Exchequer, 7; also, Torbush *v.* City of Norwich, 38 Connecticut, 225.

anchor after getting out of the slip. A very short time, it is admitted, occurred between the time when the order was given to tow the boat out and the time when she was towed out. The occasion was emergent. Confusion prevailed. There was no *one* person in admitted command anywhere. The captain of the tug acted entirely well, therefore, in towing out the vessel with such hawsers as she was provided with, and as were at her command, though they were not incombustible. The case falls within Sir Francis Bacon's illustration of the fifth rule of his Elements of the Common Law,* where, in illustration of his maxim *Necessitas inducet privilegium quoad jura privata*, he says:

"The law chargeth no man with default where the act is compulsory and not voluntary, and where there is not a consent and election; and, therefore, if either there be an impossibility for a man to do otherwise, *or so great a perturbation of the judgment and reason as, in presumption of law, man's nature cannot overcome*, such necessity carrieth a privilege in it."

If these views be correct the claim for salvage is obviously just, and need not be enforced. The tug was not the cause of setting the schooner on fire, and was the cause of saving her after she had taken fire.

*Mr. E. H. Owen, contra:*

The first three positions of opposing counsel are but feebly defended. They cannot be maintained.

1. The burning ferry-boat was in charge of the tug, and the captain of the latter was in command of all, though others may have aided him. Though the owners of the ferry-boat may have advised or even ordered the tug to take the vessel out of the dock, they did not order the tug to set our schooner on fire.

2. The schooner was lawfully lying at anchor near the middle of the river; a place where all vessels anchor. She had a good and sufficient anchor-light—that is to say a light

---

* Bacon's Works, Montague's edition, vol. 13, p. 160.

set in her forerigging—burning brightly. This is not disputed.

3. That she had no sufficient anchor-watch on duty at the time was not a fault. The statutory rules did not require such a watch. All that is required of a vessel at anchor is to have a proper light displayed.* It is not customary for vessels like the schooner to have an anchor-watch, unless it be when there is fog, or the weather is boisterous and dangerous. But the want of an anchor-watch did not cause the collision.

It is said, however, that if there had been an anchor-watch when the danger became imminent the schooner might have been sheered by the use of her wheel or her cable slipped, and so got out of the way of the burning boat. This is assumption merely. With all hands on deck she could not have been sheered far enough either way to avoid the burning boat. The ferry-boat was 164 feet long, and it came down broadside towards and upon the bows of the schooner, and struck her about midship, and, therefore, to have avoided her, the schooner must have sheered over 82 feet, which was impossible, and so the master testifies.

Nor could the cables have been slipped by a single watchman. The necessity for so slipping the cable did not arise until the boat was coming down upon the schooner, when it would have been too late to call all hands from below.

4. The ground chiefly relied on by opposing counsel is as little to be maintained as any one of the others. Whoever attempted the removal of the burning boat was bound to use precautions to prevent her from being carried by wind and tide against other vessels lying at anchor in the harbor, corresponding to the danger and consequences of such a result. The danger was extraordinary, and more than usual precautions to secure and retain control of the burning mass were, therefore, required by ordinary prudence. Reasonable care in such circumstances is not to be determined by the ordinary usages of tugs engaged in towing when no such

---

* 13 Stat. at Large, 59, Art. 7.

circumstances of peril to others existed. Proofs, therefore, of the customary practice of tugs engaged in towing vessels in and about the harbor, to use hempen hawsers only, does not furnish a satisfactory test of the caution and care due from a tug-boat professedly engaged in the business of rescuing vessels from conditions of extraordinary peril, including fire on board.

It is obvious that a chain attached to the burning boat would have prevented the loss of control over her. The use of such a chain is not proved impracticable, and it is equally obvious that it was not only practicable but easy.

No heavy anchor-chain extending from one boat to the other, which the hands of the boat could not manage, was required. All that was essential was that the attachment to the burning boat extending a few feet therefrom should be incombustible. For the rest a rope or hempen hawser was sufficient. The parties expected the flames to spread through and over the burning boat. It was this expectation which induced the attempt to remove her from the slip. In view of this it was negligence to remove her under no other control than a rope which presumptively would be burned off so soon as the expected spread of the fire should reach it. In this respect it was not like a shifting of the location of the boat with a view to the extinguishment of the fire before it should thus extend. Before any hawser was attached for the purpose of drawing her from the slip, chains were to be found both on the ferry-boat and on the tug, and it is not to be doubted that a chain of suitable length to form a connection of the hawser to the burning boat might readily have been elsewhere procured.

5. These views, as we conceive, are so obviously right that we need say nothing about salvage; that claim falling to the ground as of course, if the decree of the court below giving damages against the tug for wrongfully setting the schooner on fire, is sustained.

Mr. Justice CLIFFORD delivered the judgments of the court, giving an opinion in each of the cases. The opinions were as follows:

## I.

### IN THE CLAIM FOR DAMAGES.

#### (*The Clarita.*)

I. Vessels engaged in commerce are held liable for damage occasioned by collision on account of the complicity, direct or indirect, of their owners, or the negligence, want of care or skill on the part of those employed in their navigation. Owners appoint the master and employ the crew, and consequently are held responsible for their conduct in the management of the vessel.*

Whenever, therefore, a fault is committed whereby a collision ensues, that fault is imputed to the owners, and the vessel is just as much liable for the consequences as if it had been committed by the owner himself. Consequences of the kind, however, do not follow when the person committing the fault does not in fact or by implication of law stand in the relation of agent to the owners. Unless the owner and the person or persons in charge of the vessel sustain in some way towards each other the relation of principal and agent the injured party cannot have his remedy against the colliding vessel.

By employing a tug to transport their vessel from one place to another the owners of the tow do not necessarily constitute the master and crew of the tug their agents in performing the service, as they neither appoint the master of the tug nor employ the crew, nor can they displace either one or the other. Their contract for the service, even though it was negotiated with the master of the tug, is, in legal contemplation, made with the owners of the vessel employed, and the master of the tug continues to be the agent of the owners of his own vessel, and they are responsible for his acts in her navigation and management.

Apply those rules to the case before the court, and it is clear that the owners of the burning ferry-boat are not liable

---

* Sturgis *v.* Boyer, 24 Howard, 123.

for the consequences of the collision, as the evidence shows to a demonstration that the steam-tug was in the charge of her own master and crew, and that those in charge of her undertook, in the usual and ordinary course of her employment, to transport the burning ferry-boat from one place to another over waters where such accessory motive power is usually employed, and consequently that the steam-tug, in the absence of the officers and crew of the tow, must be held responsible for the proper navigation of both vessels, and that third persons suffering damage through the fault of those in charge of such motive power must, under such circumstances, look to the steam-tug, her master or owners, for the recompense which they are entitled to claim on account of any injuries that their vessel or cargo may receive by such means.

Whether the party charged ought to be held liable is made to depend, in all cases of the kind, upon his relation to the wrong-doer. Where the wrongful act is done by the party charged, or was occasioned by his negligence, of course he is liable, and he is equally so if it was done by one towards whom he bears the relation of principal, but the liability ceases, in such a case, where the relation of principal and agent *entirely* ceases to exist, unless the wrongful act was performed or occasioned by the party charged. Grant that and it follows, beyond peradventure, that the owners of the ferry-boat are not responsible for the consequences of the collision, as it is clear that the officers and crew of the steam-tug were the agents of the owners of their own vessel and not of the burning ferry-boat.

II. Suppose that is so, still it is insisted by the respondents that those in charge of the steam-tug were without fault; that the collision, as far as they are concerned, was the result of inevitable accident, though they insist that it might have been prevented by proper care on the part of those in charge of the schooner.

Obviously the defence of inevitable accident finds no support in the evidence, even upon the theory assumed by the respondents, as they insist that the collision was occasioned

by the fault of the schooner. Such a defence can never be sustained where it appears that the disaster was caused by negligence, for if the fault was committed by the respondent *alone* then the libellant is entitled to recover, or if by the libellant then the libel must be dismissed, or if both parties were in fault then the damages must be apportioned equally between the offending vessels.* Unless it appears that both parties have endeavored by all means in their power, with due care and a proper display of nautical skill, to prevent the collision, the defence of inevitable accident is inapplicable to the case. None of the circumstances given in evidence favor such a theory, as the collision occurred on a fair, clear evening and in the open harbor, and inasmuch as the primary cause that led to it was one which ought to have been foreseen and removed by the employment of other means to attach the two vessels together it is plain that the case is one of fault.†

III. Two faults are imputed to the schooner: (1.) That she was anchored in an improper place.    (2.) That she had no watch on deck.

1. Argument to show that the collision occurred is unnecessary, as the fact is admitted, and it is equally clear that the schooner was lying at anchor with the signal light displayed required by the act of Congress, and under those circumstances the rule is well settled that the burden of proof is upon the respondents to show either that the steam-tug was without fault or that the collision was occasioned by the fault of the schooner, or that it was the result of inevitable accident.‡

Neither rain nor the darkness of the night nor even the absence of a light from a vessel at anchor, said this court, nor the fact that the moving vessel was well manned and furnished and conducted with caution will excuse such mov-

---

* Morning Light, 8 Wallace, 557; Steamship Company *v.* Steamship Company, 24 Howard, 313.

† The Erskine, 6 Notes of Cases, 633.

‡ The John Adams, 1 Clifford, 413; The Lochlibo, 3 W. Robinson, 310; 1 Parsons on Shipping, 573.

ing vessel for coming in collision with the vessel at anchor in a thoroughfare out of the usual track of navigation.*

Mr. Parsons lays down the rule that if a ship at anchor and one in motion come into collision, the presumption is that it is the fault of the ship in motion, unless the anchored vessel was where she should not have been.†

Undoubtedly if a vessel anchors in an improper place she must take the consequences of her own improper act.‡ But whether she be in a proper place or not, and whether properly or improperly anchored, the other vessel must avoid her if it be reasonably practicable and consistent with her own safety.§

Attempt is made in argument to show that the schooner was anchored in an improper place, but both the subordinate courts were of a different opinion, and the court here, in view of the whole evidence, concurs in the conclusion that that defence is not sustained.

2. Concede all that, and still it is contended by the respondents that the schooner was in fault because she did not have a sufficient watch, but the act of Congress contains no such requirement, and inasmuch as the evidence shows that the schooner was anchored in a proper place and that one of her crew was on deck, the court is of the opinion that the charge of fault made against the schooner in the answer is not sustained.

IV. Plenary evidence is exhibited that all the parties present on the occasion expected that the flames would presently burst through the decks of the ferry-boat at the time the steam-tug made fast to her in order to drag her from the slip where she lay, and to move the vessel into the stream, and both parties agree that it was in view of that expectation that the decision was made to move the ferry-boat from her resting-place, nor is it questioned by either

---

* Steamship Co. *v.* Calderwood, 19 Howard, 246.

† 1 Parsons on Shipping, 573; The Granite State, 3 Wallace, 310.

‡ Strout *v.* Foster, 1 Howard, 89.

§ Knowlton *v.* Sanford, 32 Maine, 148; The Batavier, 40 English Law and Equity, 20; 1 Parsons on Shipping, 574.

Opinion of the court.—The claim on the schooner for salvage.

party that if those in charge of the steam-tug had used a chain instead of a manilla hawser, the object contemplated might have been safely and successfully carried into effect.

Even ordinary experience and prudence would have suggested that the part of the hawser made fast to the burning ferry-boat should be chain, and that it would be unsafe to use a hawser made of manilla. Where the danger is great the greater should be the precaution, as prudent men in great emergencies employ their best exertions to ward off the danger. Whether they had a chain hawser on board or not does not appear, but sufficient does appear to satisfy the court that one of sufficient length to have prevented the disaster might easily have been procured, even if they were not supplied with such an appliance.

All of these matters were fully considered by the district judge, and the same conclusions at which he arrived were reached by the Circuit Court. In those conclusions the court here concurs.

## II.

### IN THE CLAIM FOR SALVAGE.
#### (*The Clara.*)

In this case the owners of the schooner admit that the steam-tug ultimately succeeded in dragging the ferry-boat clear of the schooner, and that she returned to the schooner after the ferry-boat sunk, and that she rendered service in subduing the flames and saving the schooner from complete destruction, but they deny, in the most positive form, that the libellants are entitled to salvage, or to any compensation by the way of salvage on account of the services rendered, for the following reasons: (1.) Because the schooner would not have caught fire if those in charge of the steam-tug had exercised due and proper care in their attempts to tow the burning ferry-boat from her slip up the river. (2.) Because the schooner was run into and set on fire by the carelessness, negligence, and inattention of those who rendered the alleged salvage service, and not from any accident, nor from any fault or neglect of duty on the part of the schooner.

Further discussion of the matters of fact involved in those propositions is unnecessary, as they have all been conclusively determined in favor of the owners of the schooner in what precedes, which leaves nothing for decision in the case before the court, except the question whether the claim for salvage compensation can be sustained in view of the facts set forth in the propositions submitted by the respondents.

Salvage is well defined as the compensation allowed to persons by whose assistance a ship or vessel, or the cargo of the same, or the lives of the persons belonging to the ship or vessel, are saved from danger or loss in cases of shipwreck, derelict capture, or other marine misadventures.*

Other jurists define it as the service which volunteer adventurers spontaneously render to the owners, in the recovery of property from loss or damage at sea under the responsibility of making restitution and with a lien for their reward.†

Persons who render such service are called salvors, and a salvor is defined to be a person who, without any particular relation to the ship in distress, proffers useful service and gives it as a volunteer adventurer without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel.

Enough appears in those definitions to show that the elements necessary to constitute a valid salvage claim are as follows: (1.) A marine peril to the property to be rescued. (2.) Voluntary service not owed to the property as matter of duty. (3.) Success in saving the property or some portion of it from the impending peril.

Public policy encourages the hardy and industrious mariner to engage in these laborious and sometimes dangerous enterprises, and with a view to withdraw from him every temptation to dishonesty the law allows him, in case he is

---

* Maude & Pollock on Shipping, 419.

† Machlachlan on Shipping, 569; The Neptune, 1 Haggard's Admiralty, 236; The Thetis, 3 Id. 48.

successful, a liberal compensation. Those liberal rules as to remuneration were adopted and are administered not only as an inducement to the daring to embark in such enterprises, but to withdraw from the salvors as far as possible every motive to depredate upon the property of the unfortunate owner.[*]

Such compensation, however, is not claimable in every case in which work and labor are done for the preservation of a ship and cargo. Suitors, in order to support such a claim, must be prepared to show that the property was exposed to peril and that the undertaking involved risk and enterprise, and that they were successful in securing the property and saving it to the owner, and that the service was voluntary and that it was not rendered in pursuance of any duty owed to the owner or to the property. Conditions of the kind are inherent in the very nature of the undertaking, and salvors, in consideration of the large reward allowed to them for their services, are required to be vigilant in preventing, detecting, and exposing every act of plunder upon the property saved, for the reason that the right to salvage compensation presupposes good faith, meritorious service, complete restoration, and incorruptible vigilance, so far as the property is within the reach or under the control of the salvors.

Seamen belonging to the ship in peril cannot, as a general rule, claim a salvage compensation, not only because it is their duty to save both ship and cargo, if it is in their power, but because it would be unwise to tempt them to let the ship and cargo get into a position of danger in order that by extreme exertion they might claim salvage compensation.[†]

Pilots, also, are excluded from such compensation for any exertions or services rendered while acting within the line of their duty, but like other persons they may become sal-

---

[*] The Island City, 1 Clifford, 228.

[†] Miller *v.* Kelley, Abbott's Admiralty, 564; The Perkins, 21 Law Reporter, 87; The Speedwell, Ib. 99.

vors in legal contemplation, if they perform extraordinary services outside of the line of their duty.\*

Neither can passengers claim salvage unless they perform extraordinary service.†

Persons otherwise entitled as salvors cannot be defeated in making their claim because the vessel was fraudulently imperilled by the master, unless it appears that they were parties to the fraud, or were cognizant of it while it was going on and did not interfere to prevent it as far as they could, or unless they endeavored to conceal the master's misconduct and screen him from detection.‡

Where two vessels come in collision, if one is not disabled she is bound to render all possible assistance to the other, even though the other may be wholly in fault.§

Authorities to support that proposition are quite numerous, and it is very clear that if the vessel in fault renders assistance to the one not in fault, the former cannot make any claim for salvage either from the other vessel or the cargo on board, as it is her duty to render every assistance in her power.||

Services of the kind, when required by duty, do not constitute a claim for salvage, and it is expressly decided that salvors are not entitled to reward for saving property which they had by their own wrongful acts contributed to place in jeopardy, and the court here fully concurs in that proposition.¶

Text writers, also, of high repute adopt the rule that " persons who have contributed to place property in danger cannot be allowed to claim reward for rescuing it from the

---

\* The Andries, 1 Swabey, 226; Same Case, 11 Moore Privy Council, 318.

† The Branston, 2 Haggard's Admiralty, 3, note; The Vrede, Lushington's Admiralty, 322; The Two Friends, 1 Robinson, 285; Maude & Pollock on Shipping, 485; 2 Parsons on Shipping, 268.

‡ The Fair American, 1 Peters's Admiralty, 95; Parsons on Shipping, 285.

§ The Celt, 3 Haggard's Admiralty, 328; The Ericsson, Swabey, 40; The Dispatch, Ib. 140; 1 Parsons on Shipping, 529.

|| The Iola, 4 Blatchford, 31; 2 Parsons on Shipping, 289.

¶ The Capella, Law Reports, 1 Admiralty and Ecclesiastical, 356; The Queen, Law Reports, 2 Id. 55.

consequences of their own wrongful acts," which is a principle applicable in all respects to the case before the court.*

Cases may be found in which it is held that when one ship has rendered assistance to another ship belonging to the same owner that the ship rendering such assistance cannot claim a salvage reward, but the better opinion is that the rule laid down in those cases admits of exceptions, as where the services rendered were of an extraordinary character and were entirely outside of the contract duties of those by whom they were rendered.†

Exceptions also exist to the rule that a steam-tug engaged in towing may not, in case she performs extraordinary services outside of her contract, be entitled to salvage compensation, if it appears that the services were meritorious and saved the property from an impending peril which supervened subsequent to the original undertaking.‡

None of these exceptional cases, however, can benefit the libellants in this case, for the reason that the insuperable objection to their right of recovery is that the peril to which the schooner was exposed was caused by those who rendered the alleged salvage service, and to the rule that such libellants are not entitled to recover there are no exceptions when it appears that the suit is prosecuted in behalf of the wrongdoers.

DECREE AFFIRMED IN BOTH CASES.

---

* Williams & Bruce's Practice, 123; Benedict's Admiralty (2d ed.), 180.

† The Sappho, Law Reports, 3 Privy Council Appeals, 690; Same Case, 8 Moore Privy Council, N. S. 70.

‡ The Potter, Law Reports, 3 Admiralty and Ecclesiastical, 296; The Minnehaha, 1 Lushington's Admiralty, 335; Same Case, 15 Moore Privy Council, 133; Maude & Pollock on Shipping, 479.