THE DUMPER NO. 8.

(Circuit Court of Appeals, Second Circuit. January 25, 1904.)

No. 54.

1. SALVAGE—NATURE OF SERVICE BY MASTER AND CREW—EFFECT OF TOWAGE CONTRACT BY OWNER.

A contract by an owner of tugs to tow dumpers from their dumps in the city to sea and return imposed no obligation on the master and crew of one of the tugs to go to the rescue of a dumper which had been abandoned by another tug, and had drifted out to sea; and where they did so, and at considerable peril to themselves rescued her, and brought her safely to port, the service was voluntary, and they are entitled to compensation as salvors.

2. SAME—AMOUNT OF AWARD.

A salvage award of $1,175 to the master and crew of a tug, consisting of nine men, for the rescue of a dumper worth $8,000 to $10,000, which had become derelict, and drifted 25 miles out to sea in a gale, and would probably have been a total loss, *held* not excessive, where the service was entirely successful, and was performed at considerable personal risk.

Appeal from the District Court of the United States for the Eastern District of New York.

This cause comes here upon appeal by claimants from a decree of the District Court for the Eastern District of New York awarding libelants salvage to the amount of $1,175.

Le Roy S. Gove, for appellant.

Peter S. Carter, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. At about half past 10 o'clock on the morning of February 8, 1902, the master of the steam tug De Witt C. Ivins, having been notified by its owner, Michael Moran, that two of claimant's dumpers, which had been in tow of one of Moran's steam tugs, were adrift, and in danger, started to rescue them. On arriving at Sandy Hook he learned that they had last been seen about 11 o'clock. After proceeding in an east southeast course for some 25 miles he found the two dumpers abandoned by their tug, with no one on board, and drifting out to sea. The wind was blowing northwest, 50 or 60 miles an hour, there was a heavy sea on, and it was freezing weather. Dumper No. 8, the one saved by libelants, was covered with ice four inches thick all over her bow and sides. The mate of the Ivins volunteered to go aboard said dumper, provided the tug could be put alongside of her. The proposed undertaking involved risk to the tug of collision with the dumper, and risk of drowning to any one attempting to board the dumper. The risk was assumed, the undertaking was successfully accomplished, involving damage to the tug to the amount of $200, and the dumper was made fast and towed back to New York, reaching there the following morning at 7 o'clock. Another tug, the Ellis, also belonging to Moran, went down to look for the dumpers, and

¶ 2. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

found the other one, but her master testified that he was unable to get any one aboard of her, on account of the danger involved in rough sea and other conditions as stated above. The Ivins was worth $30,000; the dumper some $7,000 to $10,000. The owner of the Ivins having released the dumper and her owners from any claim of said tug for salvage, the court awarded salvage to the libelants as follows: To the captain of the vessel, $300; the mate, $200; the two deck hands, $100 each; the two engineers, $100 each; the two firemen, $100 each; the steward, $75—a total of $1,175.

There is no question as to the existence of two of the elements necessary to constitute a valid salvage claim, namely, a marine peril and success. The claimants rest their appeal on the contention that these services were not voluntary, but were included under the contract between the claimants and Moran. This contract provided that Moran should tow the dumpers from the different dumps around New York and Brooklyn to sea, and return them to the different dumps, or to the foot of Court street if they needed repairs, for a stated price. Counsel for claimants insists that these libelants were not volunteers because they were only occupied in the usual service for which they were employed and paid. There is nothing in the contract to support this contention. It was a mere contract of towage. The evidence fails to show any obligation resting on Moran, or on the crews of his tugs, to undertake to save a dumper when derelict. When the Ivins reached the dumper, under conditions already shown, the sole question was one of a voluntary service on the part of the master and crew. They were under no obligation to risk their lives and the safety of the tug in an attempt to rescue the dumper. The mate volunteered, the master acquiesced, and all voluntarily participated in the danger incident to the marine peril. The rule invoked by counsel for claimants that a master and crew thus employed are not volunteers is generally confined to those aboard the ship in peril. 3 Parsons, Contracts, 317, and cases noted. There it is generally held that the services must be considered as rendered under contract, because it would be unwise to tempt the sailors to let the ship incur perils, and afterwards allow them compensation in the nature of a reward for success in averting such perils. The Clara and Clarita, 23 Wall. 1–16, 23 L. Ed. 146. Mr. Justice Clifford says:

"A salvor is defined to be a person who, without any particular relation to the ship in distress, proffers useful service, and gives it as a volunteer adventurer, without any pre-existing contract that connected him with the duty of employing himself for the preservation of the vessel." Page 16.

The test as to whether services are voluntarily rendered is whether such services are rendered by those who are under no legal obligation to render them. Hughes, Admiralty, 129.

In The Connemara, 108 U. S. 352, 2 Sup. Ct. 754, 27 L. Ed. 751, a tug was employed to tow a ship, and both came to anchor at night. A fire broke out in the night, and the officers and crew of the tug assisted in extinguishing the flames, and were awarded salvage therefor. The Supreme Court held that the contract of the towboat and of her crew was to tow the ship, and that for such other services as rescued the ship from an unforeseen and extraordinary peril the owner,

officers, and crew of the tug boat were entitled to salvage. We conclude that the services rendered were the proper subject of a salvage award.

It is further contended that the award is excessive. Whether the amount was determined upon a valuation of the dumper at $8,000 or $10,000 is immaterial. The evidence shows that the other dumper was never found; that this one was derelict, and drifting out to sea, and would probably have been a total loss except for the efforts of these salvors. We think the award was reasonable.

The decree of the District Court is affirmed, with interest and costs.