The PENINSULAR & ORIENTAL STEAM NAVIGATION COMPANY, Plaintiff-Appellant,

v.

OVERSEAS OIL CARRIERS, INC., Defendant-Appellee.

No. 557, Docket 76–7471.

United States Court of Appeals, Second Circuit.

Argued April 6, 1977.

Decided April 25, 1977.

William M. Kimball, New York City (Burlingham, Underwood & Lord, New York City, on the brief), for plaintiff-appellant.

David P. H. Watson, New York City (Haight, Gardner, Poor & Havens, New York City, on the brief), for defendant-appellee.

Before KAUFMAN, Chief Judge, LUMBARD and VAN GRAAFEILAND, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The perils and hardships of the sea have been notorious since the voyages of Odysseus. Although the age of sirens and cyclopes is past, the isolation and uncertainty of maritime life continue to create unique problems for sailors and courts of admiralty. In this case, we must decide whether the owner of a vessel that alters course to come to the aid of a stricken seaman aboard a ship without medical staff, may recover additional fuel costs caused by the diversion. Under the circumstances of this case, we believe application of equitable principles requires reimbursement of such expenses. Accordingly, we reverse the district court's decision to the contrary.

## I.

A brief discussion of the facts, which were stipulated below, will facilitate understanding the issues raised on this appeal. The S.T. OVERSEAS PROGRESS is an American flag tanker of approximately 13,-030 gross tons and a maximum speed of about 13.8 knots (15.9 mph). Her owner, Overseas Oil Carriers, is an American corporation with its principal place of business in New York. On July 4, 1973, the OVERSEAS PROGRESS was traveling in the mid-Atlantic Ocean, en route from Haifa, Israel to Baltimore. Suddenly, the ship's fireman, William Turpin, was stricken with severe chest pains. The OVERSEAS PROGRESS did not have a doctor aboard. Her officers, suspecting that the 63-year-old seaman had suffered a heart attack, aided Turpin as best they could. Guided by the ship's medical books and radio advice from the Public Health Service, they administered several morphine injections to relieve Turpin's severe pain and gave him glycerin nitrate tablets. Nonetheless, Turpin's condition did not improve. During the evening of July 5, 1973, he suffered another attack, again accompanied by severe chest pains.

Realizing that his vessel's resources were inadequate to deal with Turpin's increasingly serious condition, the Captain of the OVERSEAS PROGRESS, W. J. Lidwin, sent out a radio message calling for responses from all ships in the vicinity with doctors aboard. Three vessels answered the call. The nearest was the S.S. CANBERRA, a British flag passenger vessel.[1] The CANBERRA, with a maximum speed of 25 knots (approx. 28.8 mph) was considerably faster than the OVERSEAS PROGRESS, and was consequently able to convey Turpin more quickly to shore facilities. Moreover, the CANBERRA itself carried a hospital with a fully equipped operating room and medical personnel able to provide Turpin with immediate attention. At the time she received the OVERSEAS PROGRESS's call, the CANBERRA was enroute to New York from Dakar, Senegal, traveling at 23 knots.

Realizing that the CANBERRA's position and equipment rendered it uniquely able to help the stricken seaman, the OVERSEAS PROGRESS directed a second radio message to the British liner, explaining that one of her crew members was in critical condition after suffering an apparent heart attack. The CANBERRA was requested to rendezvous with the OVERSEAS

---

1. The CANBERRA was owned by The Peninsular & Oriental Steam Navigation Company (P & O), an English limited liability company with its principal place of business in London.

PROGRESS and provide treatment for the ailing seaman. In response to the distress call, the CANBERRA changed course and increased her speed to 25 knots. The OVERSEAS PROGRESS, which was already traveling at maximum speed, altered course to intercept the CANBERRA.

At that time the OVERSEAS PROGRESS was 740 miles from the nearest shore hospital, at St. John's Newfoundland. It would have taken the tanker, traveling at close to maximum speed, 57 hours to reach that destination. By contrast, the meeting of the CANBERRA and the OVERSEAS PROGRESS was achieved in 6½ hours.

In the course of their radio communications, the masters of the CANBERRA and the OVERSEAS PROGRESS briefly considered the allocation of the rescue effort's costs. Captain Snowden of the CANBERRA informed Captain Lidwin that the CANBERRA's owner, the Peninsular & Oriental Steam Navigation Co. (P & O), "may look" to the owner of the OVERSEAS PROGRESS for "reimbursement of diversion costs, medical and out of pocket expenses." Captain Lidwin did not in any way indicate that such compensation would be refused. When the two ships met, Captain Snowden presented a letter reiterating the likelihood that P & O would seek reimbursement. This letter was then countersigned by Captain Lidwin. The parties have stipulated that this document was neither a demand for payment nor an agreement to reimburse the CANBERRA; rather, the ships' masters indicated an awareness of the problem and simply left open the question of payment for subsequent determination by the vessels' owners.

Upon encountering the OVERSEAS PROGRESS, the CANBERRA lowered one of her lifeboats and transferred William Turpin aboard. He was examined by the CANBERRA's surgeon, who diagnosed his illness as a myocardial infarction, a form of heart attack that results in the partial destruction of the central heart muscle. After taking Turpin aboard, the CANBERRA resumed her course to New York at maximum speed, 25 knots. Despite the fact that she had traveled an additional 232 miles to aid Turpin, the increased velocity enabled the CANBERRA to arrive in New York only 2½ hours later than her scheduled arrival time. Turpin was rushed by ambulance to the United States Public Health Hospital on Staten Island. Eventually, he recovered and was discharged.

Overseas Oil Carriers, the owner of the OVERSEAS PROGRESS, promptly paid $248 to the CANBERRA's surgeon for medical expenses rendered to Turpin. But it was far less generous in responding to P & O's request for reimbursement. In response to P & O's letter of September 26, 1973, seeking $12,108.95 for Turpin's accommodation and nursing while on the CANBERRA and, principally, for the additional fuel consumed by the liner as a result of the extra distance traveled and the increased speed the CANBERRA had required to reach New York without serious delay, Overseas Oil Carriers's agent, in a letter dated October 3, declined to pay any part of this amount. Although the agent wrote, "we are extremely grateful for the kind assistance you have rendered Mr. Turpin", he continued to assert that payment of the claim would be out of keeping with the "traditional concept of rescue at sea."

On April 26, 1974, P & O filed a complaint in the Southern District of New York, seeking recovery of the $12,108.95 it had requested previously. The parties each moved for summary judgment on stipulated facts. In an opinion dated August 20, 1976, Judge Goettel granted recovery of $500 for nursing services but denied any reimbursement for the CANBERRA's additional fuel expenses. He noted that under traditional admiralty doctrines of "salvage", there could be no reward for "pure life salvage", i.e. a rescue at sea where men's lives are saved but property is not simultaneously recovered. Judge Goettel also rejected any claim based on "quasi-contract" because he failed to find "misconduct or fault" by Overseas Oil Carriers. He did, however, grant recovery for nursing services since Overseas would have been obliged to pay

such costs if Turpin had been placed in a shore hospital. We believe, that the CANBERRA, in saving the life of Seaman Turpin, did more than uphold the great traditions of the sea. In discharging the OVERSEAS PROGRESS's request, the CANBERRA earned the right to recover the fair value of the services rendered. We accordingly reverse the judgment below.

## II.

 When Turpin fell ill, the Captain of the S.T. OVERSEAS PROGRESS became obligated to make reasonable efforts to provide him with swift medical care, pursuant to the ship's responsibility for "maintenance and cure". This ancient admiralty doctrine has been described as a preindustrial analogue to modern "workman's compensation" statutes.[2] If a sailor is stricken with injury or illness at sea, not caused by the seaman's own willful misconduct, his employer must assume responsibility for his medical care, food, lodging and wages for a reasonable period. *The Bouker No. 2*, 241 F. 831 (2d Cir.), *cert. den.*, 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529 (1917), 2 Norris, *The Law of Seamen* § 542–544 (1970).

 On vessels that do not carry a surgical staff, the ship's master has a duty, in the sound exercise of his judgment and depending on the circumstances, to have the seaman taken speedily to a hospital or the nearest port where surgical care may be obtained. *The Iroquis*, 194 U.S. 240, 243, 24 S.Ct. 640, 48 L.Ed. 955 (1904); *The Cuzco*, 154 F. 177 (2d Cir. 1907); Norris, *supra*

§ 584. Without the assistance of the S.S. CANBERRA, or a vessel with similar facilities, performance of this duty would have required the OVERSEAS PROGRESS to travel to the shore hospital at St. John's, Newfoundland, entailing a considerable expenditure of time and additional fuel. The CANBERRA, by agreeing to rendezvous, provided Turpin with swifter medical attention and saved the OVERSEAS PROGRESS considerable costs. Through her expeditious intervention, the CANBERRA performed the OVERSEAS PROGRESS's duty to Turpin, far more swiftly and more efficiently than it could have been carried out by the OVERSEAS PROGRESS. In such circumstances, the principles of "quasi-contract" require recovery.

 Although the law ordinarily frowns on the claims of a "mere volunteer", there is a class of cases where it is imperative that a duty be performed swiftly and efficiently for the protection of the public or an innocent third party, in which a "good Samaritan" who voluntarily intervenes to perform the duty may receive restitution for his services. This rule has become crystallized in the doctrine that performance of another's duty to a third person, if rendered by one qualified to provide such services with intent to charge for them, is a ground for recovery in quasi-contract. This principle is limited to cases where the services are immediately necessary to prevent injury or suffering. *Greenspan v. Slate*, 12 N.J 426, 97 A.2d 390, 397 (1953) (Vanderbilt, C.J.); *Restatement of Restitution* § 114. *Cf. Wyandotte Trans. Co. v. United States*, 389

---

2. Norris, *Law of Seamen* (1970) § 538 *et seq.* The history of this doctrine may be traced to the Laws of Oleron, (Roll D'Oleron). This maritime code, which originated in Gascony, is believed to have been introduced in England by Richard I after his return from the Holy Land. It enunciated a doctrine remarkably similar to the present rules of maintenance and cure, providing, *inter alia*:

> If it happens that sickness seizes on any one of the mariners, while in the service of the ship, the master ought to set him ashore, to provide lodging and candlelight for him, and also spare him one of the ship-boys, or hire a woman to attend him, and likewise to afford him such diet as is usual in the ship . . . .

The Code, however, was far less solicitous of injuries obtained through "willful misconduct", particularly while on land. It stated:

> If any of the mariners hired by the master of any vessel, go out of the ship without his leave, and get themselves drunk, and thereby happens contempt to their master, debates, or fighting and quarreling among themselves; whereby some happen to be wounded: in this case the master shall not be obliged to get them cured . . . . Norris, *supra* § 540.

U.S. 191, 204, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

■ The circumstances of this case compel application of the rule. The OVERSEAS PROGRESS had a manifest duty to provide Turpin with speedy medical attention. Her Captain, in the exercise of his reasonable discretion, asked the CANBERRA to perform that duty in her stead. It is undisputed that the CANBERRA, with her fully equipped hospital and greater speed, was a proper party to provide such services, and the countersigned letter from the CANBERRA's Captain suffices to demonstrate the liner's intent to charge.[3]

■ Moreover, this is not a case in which a "good Samaritan" volunteered his services without the knowledge or consent of the person whose duty was discharged. OVERSEAS PROGRESS actually *requested* the CANBERRA to come to Turpin's aid. This decision was made after full consideration of the seaman's condition and other available sources of medical assistance.[4]

### III.

■ Overseas contends that the principles of quasi-contract, though presumably reflecting our sense of fair and orderly arrangement of affairs on *terra firma*, should not be applied to occurrences on the sea. We fail to perceive any reason for this distinction. Although it is true that the fortuitousness of jurisdiction in eighteenth century English courts long left the application of restitutionary principles to admiralty in doubt, today the law is clear that quasi-contractual claims may be considered by the federal courts in admiralty if they arise out of maritime contracts, see *Archawski v. Hanioti*, 350 U.S. 532, 536, 76 S.Ct. 617, 100 L.Ed. 676 (1956), or other inherently maritime transactions, *see Sword Line Inc. v. United States.*[5] It is difficult to imagine a transaction more maritime in nature than the one presented here, where two ships arranged a rendezvous on the high seas in order to save the life of a sailor for whom, by ancient admiralty doctrine, one of the ships was responsible.

■ Overseas urges that quasi-contractual recovery under these circumstances would, in effect, subvert the long-established rule in admiralty that prohibits recovery for "pure life salvage". In admiralty, a person who rescues property at sea may obtain an award based not merely on the costs he incurs but on the value of the property saved and the degree of danger encountered. These rules are designed to encourage seamen to render valorous service in the salvage of property, and remuneration has accordingly been liberal. *The Clarita and the Clara*, 23 Wall. 1, 17, 90 U.S. 1, 17, 23 L.Ed. 146 (1874); *Gilmore and Black, supra, Law of Admiralty,* § 8–1. Yet it seems to have been admiralty law that rescuing lives at sea, rather than prop-

---

**3.** Although the parties have stipulated that the letter was not a demand for payment, it was sufficient to put Overseas on notice that the services were not intended as a gratuity.

**4.** Moreover, the CANBERRA's actions represented a tangible pecuniary benefit to the OVERSEAS PROGRESS. Without her assistance, or that of a similar ship, the OVERSEAS PROGRESS would have incurred much greater delay and fuel expenses in transporting Turpin to a shore hospital. It is not necessary, in cases of this character, that the "benefit" conferred be of a monetary nature. The value rendered in performing another's duty is sufficient to permit recovery. Thus, if the OVERSEAS PROGRESS had been totally unable to reach a shore hospital and the CANBERRA had been Turpin's only source of aid, it might be argued that her intervention, although vital to Turpin, did not save OVERSEAS PROGRESS

from incurring any additional expense. CANBERRA could nonetheless have recovered for providing such assistance. In this case, however, where performance of another's duty and traditional "unjust enrichment" are present, both rules clearly require recovery.

Judge Goettel followed a similar analysis in awarding P & O restitution for Turpin's nursing and accommodation aboard the CANBERRA, noting that these were expenses normally borne by the shipowner. The costs of swiftly bringing a disabled seaman to a surgeon are also part of the shipowner's duty of maintenance and cure, and there seems no reason to grant recovery of one expense and not the other.

**5.** 228 F.2d 344 (2d Cir. 1955) *on rehearing* 230 F.2d 75, 77 (2d Cir.), *aff'd* 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493 (1956).

erty, merited moral approbation, but no pecuniary reward.[6]

■ Overseas bids us to ignore the sound reasons that warrant recovery in this case, and to defer instead to this hoary, and almost universally condemned, rule of the sea. But, we do not find the rule on pure life salvage, regardless of its dubious vitality, relevant to the facts. P & O is not seeking a reward; it merely requests reimbursement for its expenses. And, we do not confront a daring "rescue at sea", but the transfer of an ailing seaman from one seaworthy vessel to another. Under these circumstances we do not believe the questionable doctrine of "pure life salvage" bars recovery.

Finally, Overseas contends that the rule we announce today will disrupt traditional maritime practices, making assistance to an ailing seaman a matter of negotiation rather than moral duty. On the contrary, we believe this rule will encourage seamen aboard large vessels to perform their moral obligation to their brethren on smaller ships without fear their benevolence will result in unreasonable expenses to their ship's owners.

Overseas also predicts that masters of small ships will be reluctant to call for aid, knowing their actions may result in the imposition of sizable fuel costs. But, masters are already under a legal obligation to make *reasonable* efforts to secure medical care for their stricken crewmen. In determining the proper course of action, they must consider the seriousness of the seaman's illness, the availability and adequacy of medical facilities and the costs that will be incurred in securing aid. Once it is established that the fuel expenses of a ship rendering assistance is one of these costs, it will simply become another factor to be considered in the master's calculation. With radio-telegraphy, it is a simple matter for him to ascertain the size and location of ships in the vicinity, just as the OVERSEAS PROGRESS did, and to determine which vessel can be reached with minimum expense and delay. Thus, we believe the rule we announce today will result both in greater willingness of large vessels to render assistance and in the utilization of the medical facilities of those vessels in the most efficient and productive manner.

## IV.

■ Although we believe the masters of both vessels acted admirably and, as Judge Goettel noted, "in keeping with the finest traditions of the sea", the OVERSEAS PROGRESS was in a far better position to evaluate the relevant costs and benefits of seeking various forms of aid for Turpin. It was her master's decision to summon the CANBERRA that entailed the fuel expenses at issue here. Since vessels such as OVERSEAS PROGRESS are best able to avoid unnecessary costs in obtaining medical aid for their crewmen, we conclude that the owners of such ships are liable for the reasonable value of services rendered by other vessels at their request, regardless of the value of the benefit actually conferred.

■ In many circumstances, reasonable value may be determined by the market price for obtaining comparable services. But here, the CANBERRA's assistance was *sui generis*, since no other vessel could have reached Turpin as swiftly, and thus, none could have provided comparable medical care to a man in his critical condition. Under these circumstances, the only possible measure of "reasonable value" is the reasonable expense incurred by CANBERRA as a result of her assistance to Turpin. The

6. This rule was modified by the enactment of 46 U.S.C. § 729 in 1912. That statute allowed life salvors to receive a fair share of a property salvage award arising out of the same maritime accident. It was intended to remove the disincentive to life salvage that resulted from the traditional rule, which encouraged sailors to rescue property rather than aid fellow seamen in jeopardy.

The irrationality of providing rewards for property salvage but not requiring payment for rescuing lives has been under attack for many years. L. Jarett, "The Life Salvor Problem in Admiralty", 63 *Yale L. J.* 779 (1954). Under British statutory law, a person who saves a life on a British vessel anywhere in the world, or on a foreign vessel in British waters, may claim a life salvage award. *Jarett, supra*, p. 782–83.

parties have agreed that such expenses represent $8,500 of P & O's claim.[7] Accordingly, we reverse and order judgment entered for Peninsular and Oriental Steam Navigation Co. in the amount of $8,500.

---

7. In the stipulated fact statement before the district court, Overseas did not concede that the additional fuel cost occasioned by the CANBERRA's increased speed to New York was proximately caused by the rendezvous with the OVERSEAS PROGRESS. During oral argument, this Court asked Overseas to attempt to arrive at agreement with P & O on this factual issue so that a remand for damages could be avoided, if we decided to reverse. The parties have since informed this Court that $6,294.30 of the expense involved in increasing speed was attributable to Turpin's illness. This amount, added to $2,205.70 for fuel expended by the CANBERRA's diversion, results in a total claim of $8,500.