TAN–TAR–A, INC., Plaintiff,

v.

F/V PANTHER and Stephanie Jane, Inc., Defendants.

Civ. No. 92–258–P–H.

United States District Court, D. Maine.

June 22, 1993.

Jay F. Meyer, Thompson, McNaboe, Ashley & Bull, Portland, ME, for plaintiff.

Michael X. Savasuk, Portland, ME, for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

HORNBY, District Judge.

This case arises out of a collision between two fishing vessels around 4:30 a.m. on February 12, 1992. The PANTHER, a steel-hulled vessel, ran into the LESLIE ELLEN, a fiberglass and wood vessel at anchor on Cash's Ledge, a popular fishing ground off the Atlantic coast. Fortunately no personal injuries were suffered. There was extensive physical damage to the LESLIE ELLEN, however. The parties dispute responsibility for the collision. The reasonable cost of the repairs has been stipulated, but the amount of time the LESLIE ELLEN was reasonably out of service, the amount of her lost profits, and the expenses for having her repaired at a distance from Portland, Maine, are disputed. The parties also dispute whether repairs to the PANTHER were required by the collision and what lost profits were suffered by the PANTHER as a result of the need to make these repairs.

I heard testimony at a bench trial on May 24 and 25, 1993. Some of the testimony raised serious credibility issues. For example, experienced seamen who were on the two vessels estimated the seas at the time of the collision variously from 3 to 6 feet to 15 to 20 feet. One of the seamen who testified to 6- to 8-foot swells admitted that he had originally told the Coast Guard that the seas were 10 to 15 feet. He happens to be the captain of the plaintiff's vessel. The trial testimony of the captain of the defendant's

vessel also differed in some ways from a statement that he had given immediately upon returning to port after the collision. My findings, therefore, take into account that not every witness was testifying candidly and forthrightly at all times.

The following are my Findings of Fact and Conclusions of Law.

1. Jurisdiction is based upon this court's admiralty jurisdiction.

2. On the night of February 11 and the early morning of February 12, 1992, the weather was clear and visibility was good in the general area of the collision. The lights of other boats could be seen for five to eight miles.

3. The winds were 25 to 30 miles per hour out of the northwest and were following winds for the PANTHER on her trip to the fishing grounds. The seas were 10 to 15 feet.

4. The temperature was below freezing. The PANTHER, however, received little freezing spray because the seas were following her.

5. The LESLIE ELLEN anchored on Cash's Ledge near the "Twenty–Seven's" on February 11, 1992. She was firmly anchored and not drifting or dragging—as evidenced by her Loran coordinates, kept and checked regularly; by the silent anchor alarm, set to go off if drifting of two miles occurred; and by the difficulty of pulling up anchor the next morning. Because the LESLIE ELLEN was at anchor she ordinarily rode into the wind and therefore received some freezing spray. My finding that the LESLIE ELLEN was making ice is confirmed by the fact that her captain stated the next morning that he needed to chip ice off before leaving.

6. Prior to and at the time of the collision the LESLIE ELLEN was showing an all round white light (anchor light) approximately 12 feet above the waterline on top of her wheelhouse. She was also showing her green and red sidelights.

7. I find that some ice buildup occurred on the anchor light, restricting its visibility to some degree, but that the light was still visible. I am not persuaded that its visibility was reduced below two miles. *See* 33 U.S.C. § 1602, Rule 22(b).

8. While at anchor the LESLIE ELLEN did not have her radar operating nor did she have a regular watch posted. Instead, her captain got up from time to time to look around and then return to his bunk.

9. The location where the LESLIE ELLEN was anchored is neither a shipping channel nor a recognized anchorage. Instead, it is a fishing ground where fishing vessels are often located.

10. As a wood and fiberglass vessel, the LESLIE ELLEN was a poorer radar target than a steel vessel like the PANTHER. The LESLIE ELLEN had no radar reflectors installed on her. Her fishing buoys, which were stored on her roof, did contain radar reflectors. They were not arranged, however, so as to provide a vertical surface to reflect the radar signal. The LESLIE ELLEN, however, was not invisible on radar. In good conditions she was visible on radar up to eight miles. I conclude, therefore, that she was not required to install a radar reflector under 46 C.F.R. § 28.235(b). Thus, the presumption of causation from *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), does not apply in this connection.

11. The PANTHER was underway at approximately seven knots heading southeast. Her captain was sleeping in the wheelhouse in his bunk and the PANTHER was on autopilot. The crew stood successive two-hour watches.

12. The PANTHER's bow structure is such that when the vessel is lying flat in the water her bow obstructs the view from the wheelhouse so that a person in the wheelhouse cannot see where the sky meets the water. This visibility obviously can be improved or made worse depending upon whether the vessel is descending or ascending a swell. In order to obtain a 360° view from the vessel, a crew member must either go to an elevated ball cage behind the wheelhouse or move around on deck. The additional steering station to the starboard removes the obstruction to the view on the starboard but not on the port side.

13. The PANTHER was equipped with two radar sets. On the night and morning in question, however, the crew was operating only one radar set. Upon leaving Portland harbor, the captain had set its range at six miles and expected the crew not to alter it. Crew member Findley had been on watch from about 2:30 to 4:30 a.m. He stood at the wheel dressed only in longjohns and wore a blanket over him. The wheelhouse was about 50°F. I find that dressed as he was, and given the below freezing temperature and winds outside, he did not make regular excursions out on deck to examine 360° of the horizon for other vessels.

14. At 4:30 a.m. crew member Desjardins took the watch. When he got out of his bunk he went outside onto the starboard side to relieve himself. He was dressed only in a T-shirt, sweatpants and sneakers. He took a quick look for other vessels but dressed as he was I find that he did not make any exhaustive search for vessels. Moreover, from this vantage point on the starboard side he could not see to the port side. Given the height of the seas and the bobbing up and down of the PANTHER, as well as the bobbing up and down of any other vessels, it was necessary to examine the seas for some time to be sure to see the light of any other vessel.

15. After relieving himself and taking a quick look from the starboard side, Desjardins relieved Findley. He checked the radar and saw no evidence of any vessels other than two that Findley said the PANTHER had already passed.

16. Ten minutes later, after the change of watch, without any sighting on the radar or any sighting of lights by Desjardins through the wheelhouse windows, the PANTHER collided with the LESLIE ELLEN.

17. The PANTHER's crew was negligent in the following respects.

A. The crew should regularly have surveyed the entire horizon forward of the bow for other vessels and not limited themselves to what they could see inside the wheelhouse with the obstructed view caused by the design of the prow and the limited visibility through the wheelhouse windows. A quick check outside every two hours at the change of the watch by inade-quately dressed crew members was not sufficient, in either scope or frequency.

B. The PANTHER should have adjusted her radar equipment from time to time in its range and gain (including sea clutter) to look for unidentified vessels, especially as she was approaching the fishing grounds.

I find that either of these actions—a better visual watch or a better radar watch—would have revealed the LESLIE ELLEN and avoided the collision.

18. The LESLIE ELLEN was also negligent. Her anchor light was only 12 feet above the water. Since the seas were 10 to 15 feet high, her crew should have known that the anchor light would often be invisible to other vessels. Its visibility was further impaired by the icing conditions. The crew also should have known that the LESLIE ELLEN was not a good radar target.

19. The experts at trial disagreed over the obligation of the LESLIE ELLEN to post a watch. I find that it is not the practice in the fishing industry for vessels of her size to maintain a watch at anchor and that it is ordinarily not negligent to fail to do so. Given the seas, the icing conditions and the nature of her radar image, however, and given the fact that she was anchored in a location that, although not a channel of navigation, was an area frequently trafficked by other fishing vessels, the LESLIE ELLEN should have taken further precautions, either by providing additional lights, such as her deck lights, or by turning on her own radar with an alarm setting to alert the crew as vessels approached. The LESLIE ELLEN had the radar capacity to do the latter. The effect of the deck lights is demonstrated by the fact that after the collision it was necessary to turn on the deck lights so that the LESLIE ELLEN could be distinguished by the PANTHER from another fishing vessel in the general area.

■ 20. I recognize the presumption that where a moving vessel collides with an anchored vessel the presumption is that the moving vessel is liable. *The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); *The Clarita and The Clara,* 90 U.S.

(23 Wall.) 1, 13, 23 L.Ed. 146, 23 L.Ed. 150 (1874). Here, the most flagrant negligence was attributable to the PANTHER. Nevertheless, I also find that the conduct of the LESLIE ELLEN was negligent to a lesser degree. *See The Oregon*, 158 U.S. at 201, 15 S.Ct. at 810, 811 ("where the circumstances of the case are such as to demand unusual care, such care should be exercised"). I find the comparative degrees of the respective vessels' negligence to be 80 percent the PANTHER and 20 percent the LESLIE ELLEN.

21. The reasonable cost of the repairs to the LESLIE ELLEN is stipulated at $15,495.19. The plaintiff has not shown, however, that it was necessary to travel to Stonington to obtain these repairs and I conclude that they could have been obtained at this price in Portland. Consequently, the costs of travel to Stonington for the plaintiff's president are not allowed. I also find that, by using a distant yard, the plaintiff was not able to monitor the progress of the work effectively and that the repairs, which took two months, thereby took longer than was reasonably necessary. The repairs could reasonably have been completed in 30 days.[1]

22. I find that the damage to the PANTHER's bleeder valve in the keel cooler pipe was not caused by the collision. Accordingly, no damages are awarded to the PANTHER for the cost of repairs or her lost fishing time.

23. I calculate the LESLIE ELLEN's lost profits as follows. Until 1992, the LESLIE ELLEN had engaged solely in gill netting. Her first trip longlining occurred in February before the accident and yielded a profit to the vessel of $752.16. After the accident and repairs she engaged in six longline trips before reverting to gill netting. Her profits on those six trips were respectively $2,488.30; $2,048.54; $2,324.89; $2,498.60; $2,709.86; $1,897.24. I ignore the February trip as a first trip where the vessel had not yet adjusted to the new venture. The average of the other six trips is $2,327.90 per trip. Based on her experience in May

and June, I conclude that the LESLIE ELLEN could make three trips in 30 days, the period that I have found was reasonable for her to be laid up under repairs. The total lost profit to the vessel, therefore, is $6,983.70.

24. The total damages to the LESLIE ELLEN, therefore, are $22,478.90. The PANTHER is liable for 80 percent of these. Accordingly, judgment shall enter for the plaintiff in the amount of $17,983.12, interest and costs.

So Ordered.

---

1. I have not found material the testimony of Mr. Stinson from the Stonington yard that he delayed the repairs because of the plaintiff's president's vacation plans. Consequently, it is unnecessary to rule on the motion to strike that testimony.