BOWERS *et al. v.* THE EUROPEAN, etc.

*(District Court, S. D. Florida.  December, 1890.)*

SALVAGE—FIREMEN EXTINGUISHING FIRE ON SHIP.

Where a steam-ship with a cargo of cotton on fire came into port, and, in the absence of any private means, the fire department, consisting of volunteer fire companies, who receive no compensation from the city, were called upon, and an understanding had that they would be paid for their services, and on account of their presence the steam-ship was permitted to come to the wharf, and the firemen, with two steam fire-engines, were engaged five and a half days putting out fire and discharging burning cotton, a salvage of $12,000 on a value of about $300,000, giving the firemen about $65 apiece, was given. The *Case of The Mary Frost*, 2 Wood, 306, examined and compared.

*(Syllabus by the Court.)*

In Admiralty.

*L. W. Bethel,* for libelants.
*G. Bowne Patterson,* for claimant.

LOCKE, J. This steam-ship, laden with about 6,000 bales of cotton and 24,000 bushels of corn, bound from New Orleans to Bremerhaven, when about 60 or 70 miles to the north-eastward of this port, Key West, was discovered to have fire in the cargo in the forward hold. The master did everything in his power, but could not extinguish the fire, and turned back to port, where he arrived at about 4 or 5 o'clock in the afternoon of the 3d of November. He made application to his vice-consul, and to Lloyd's agent, who assisted him in procuring the only steampump, available, belonging to private parties, and chartered two schooners, one to take the pump off to his steamer, and the other to receive cargo. But it was soon found that it was impossible to get the fire under control with the pump procured, and at about 2 o'clock the next morning it was decided to make application to the fire department of the city of Key West for aid. It had been found impossible to obtain permission to come to a wharf on account of the fire, and the steamer was lying off in the harbor. The consul and Lloyd's agent, upon the request, and in behalf, of the master, called up the chairman of the fire committee of the city government, and inquired if the services of the city engines and fire department could be procured to aid in extinguishing the fire. It appears that the board of city commissioners had been in session at the time of the arrival of the vessel in the port, and had resolved that, in event the services of the fire-engines were necessary and requested, the request might be granted, if private means could not be obtained; and the matter was left in the hands of the chairman of the committee on fire matters, to whom application was now made. In soliciting the aid of the fire department, it was asked upon what terms the firemen would work, and the reply was, "Upon the same terms as was paid in the case of *The San Juan.*" That was a dollar an hour for the firemen that worked. The reply was that that was perfectly satisfactory, and it was requested that the engines and firemen be called out as quickly as possible. Upon condition that the fire department should be on hand to prevent further danger, the ship was permitted to come to the wharf. An alarm was rung, two steam fire-engines and nearly the entire force of firemen came to the wharf, to which the ship soon came, when they commenced work at about 4 o'clock in the morning of the 4th of November, 1890. They cut eight holes in the deck, and commenced pouring in eight streams of water, but after some five hours decided that the water had found channels through the cotton to the bilge of the ship, and was doing no further good, when the hatches were removed, streams played upon the burning cotton, and the firemen commenced discharging cargo. They continued unceasingly, discharging cargo and playing water upon the bales as they came out, for five and a half days, or until 4 o'clock Sunday afternoon, when it was decided that the fire was entirely out, and they ceased their efforts.

It is claimed in the libel, and shown in evidence, that 178 firemen

were engaged in the work, and were in attendance, with a few exceptions, the entire time; that, when not actually at work, they slept on the dock, under a tent or some shelter, and were only absent from the place while they were getting their meals; that for the first 50 or 52 hours it was impossible for them to work more than 10 or 15 minutes at a time in the hold, and the entire number were constantly in attendance, ready, when called upon, to relieve those coming out. After that the smoke became less severe, and they were able to remain longer, and make regular gangs and reliefs. They then had one hour in the hold, or on duty, and two off; sometimes two hours on, and four off; but it appears that, as a general thing, the entire company was in attendance, ready to respond to a call all of the time for about 130 hours, although a comparatively small portion of them could work at a time. The labor was severe and disagreeable, the smoke was dense and pungent, the cotton bales full of fire, and liable to burst into flames at any time when exposed to the air. There were two physicians in attendance much of the time, and one constantly, to bathe and attend to the eyes of those coming out of the hold. Burns and bruises were frequent. There is no complaint but what the labor was performed as rapidly as the circumstances would allow, and completed with all the dispatch possible. Of the cargo, all in the forward compartment of the ship, about 4,000 bales, were taken out. The fire commenced low down in the cargo, and must have been burning some days. Some of the bales of cotton (it is impossible to tell just how many) had been entirely consumed, about 300 partially burned, some of them very badly, and a large number of the 4,000 damaged by water. About 11,000 bushels of corn was so damaged by water that it had to be sold. The ship's decks forward of the foremast and the berths under the forecastle head were entirely burned out, and the forecastle head and fittings badly damaged. Otherwise, it does not appear that the vessel was materially injured. The steam fire-engines were owned by the city. There were two of them in attendance, with steam up, for the entire time of the service. The city has been paid $1,200 for the use of the engines, or $5 an hour for each.

The chief of the fire department acted also as fire-warden, and receives $25 per month for his services. Each steam-engine has an engineer and driver, supposed to be constantly in attendance at their engines, who are paid monthly wages. Aside from these, the fire department, or the entire force of firemen, consists of volunteer fire companies, who receive no compensation for their services whatever, whether called to a fire or not. Their services are entirely voluntary and gratuitous, and there is no employment contract or agreement between them and the city government, further than is implied by their organization. They have on several occasions been called upon to extinguish fires in the cargoes of vessels arriving in port, and have always been compensated for such services, although there has never before been any agreement made; but they have been paid a round sum.

In this case the libelants sue upon a contract, alleging that one was

made between Mr. Taylor, H. B. M. V. Consul, and Mr. Fogarty, resident agent of Lloyd's, acting for and in behalf of the master of the ship, and Mr. Fulford, chairman of the fire committee of the city, Mr. Bowers, chief of the fire department, and Mr. Walton, secretary, acting for the firemen, which libelants construe into being for the payment of one dollar per hour for each one that worked and was in attendance, for the entire time engaged during the service, whether actually at work or not, the same as was paid in the case of *The San Juan*.

In answer it is alleged that, when informed that the firemen expected one dollar an hour for their labor, the same as was paid in the Spanish ship *San Juan*, no objection was made, as the ship was on fire, and their services were indispensable, but that the libelants never worked the number of hours claimed. It is also answered that the libelants, as firemen of Key West, while in the performance of the services were only acting in the line of their duty as such firemen; that as such they had no authority to make contracts or demand compensation for their services; that the municipality of Key West has not authorized them to bring suit; and that no service they have rendered can give them a lien on the vessel, enforceable in admiralty by a proceeding *in rem*.

This defense is upon the assumption that the firemen in no way exceeded, in the services rendered, the duty they owed the public through their character as firemen, and in the performance of that duty they had no power to make contracts or demand compensation, nor had they power to render a salvage service, or demand compensation for services as such. The case, therefore, depends entirely upon the duty of the libelants, as firemen, towards this property. As between the property and any one else, this would unquestionably have been a salvage service, and any contract, alleged or proven, would have been considered in connection with the idea of the condition* of the property at the time.

The question of the relation of firemen to property in jeopardy from fire on board vessels is not free from difficulty. The case of *Davey* v. *The Mary Frost*, 2 Wood, 306, has been relied upon in support of the proposition that in this case the duty of the firemen was such as to preclude the idea of a salvage service, or their power to make a contract to perform such a service, and receive compensation therefor. If this view is accepted, it may be urged as strongly against the suit on a contract as it could be in a suit for salvage *eo nomine;* for what a person is bound to do without compensation, the making of a contract under circumstances of compulsion cannot release him from doing, or give him greater rights for pay. The language of the learned justice in the case cited, as well as that in the case of *The Suliote*, 5 Fed. Rep. 99, in which the same views are expressed, although the question was not before the court, shows clearly that, in the opinion of the court, the circumstances of those cases brought it directly within the positive duty of the firemen to extinguish the fire. These are the only cases in which such principle is declared; and while, in view of the circumstances of those cases, such decision is most cordially approved, yet the question remains whether the difference in the circumstances may not justify a different conclusion from that reached

therein. In the case of *The Blackwall*, 10 Wall. 1, it is stated in the argument that the firemen made no claim for salvage, because they were paid by the city; but the court, in its opinion, says: "Pilots under some circumstances may become salvors, and cases may be imagined where firemen perhaps might come within the same rule;" and strongly intimates that the moiety of the salvage earned by the firemen might be paid them, upon petition, out of the funds in the registry of the court.

It is true that these declarations and intimations are outside the case, and can have no further weight than as expressing the views, at the time, of the highest court in the land upon the subject; but they certainly have as much weight and authority as do the declarations in the case of *The Suliote*. In the case of *The Huntsville*, cited in Cohen's Admiralty, 74, a full report of which case I regret that I have not access to at present, it was held that, where the fire in a ship ashore was extinguished by the firemen upon the understanding that the owners of the vessel, and not the city, were to pay the expenses, they were entitled to salvage compensation. In the case of *The Ethiopian*, Mitch. Mar. Reg. 1883, p. 589, where the cargo was on fire, salvage was awarded to the Gravesend fire brigade, who aided with one of their fire-engines. These cases satisfy me that it has not been established, as is contended herein, as a principle of law, that under no circumstances can firemen earn salvage, but that the question depends entirely upon the circumstances of the individual cases.

Not every one is bound to render gratuitous service, even if it is his duty to do what is in his power to save life and property from marine disaster. It is certainly the duty of pilots to do what they can to assist vessels in distress, but courts have repeatedly held that the circumstances of the case would justify a salvage award. The licensed wreckers of this district are bound by their licenses and the rules of this court to proceed to the aid of any vessel in distress, but the idea of a gratuitous service has never been contemplated. Government vessels, officers, and men of the coast-guard, and even agents of underwriters, have been held to be entitled to salvage whenever the services they render exceed in the least the actual duty they are bound to perform gratuitously. Did the service rendered in this case by libelants exceed the duty they owed this property? or were their relations to it such as would of right demand such services gratuitously? The language of the learned justice in the cases of *The Mary Frost* and *The Suliote* shows plainly that he considered that in those cases the firemen did no more than their ordinary duty, and no more that they were bound to do; and upon that consideration the conclusions were reached. In the case of *The Suliote* he mentions the firemen being employed to do this very duty. There had been no employment of the libelants by the city, or payment for their services in this case. There was only their voluntary organization, and their holding themselves in readiness to extinguish fires. Was it ever contemplated in such organizing that they assumed the duty of performing such services as were rendered in this case? The firemen were in duty bound to do all that they had ever impliedly agreed to do, but had they agreed

by any implication to do this?  There was no privity of interest between the owners of this property and libelants.  The vessel did not come here to receive cargo, or as to a port of discharge.  She was in no way connected with the business or interests of the city.  The fire did not originate in the city, but at a great distance from it, and was voluntarily brought within its limits after it had become an element of danger.  It did not threaten the city, or the property of any of its citizens, as the vessel was lying in the stream at such a distance that, had she been entirely consumed, no harm would have come to any building or wharf. The labor was not of a few hours only or less, such as is gratuitously rendered to the property of the citizen by firemen without materially interfering with their means of livelihood, but the service from the outset contemplated days and nights of arduous labor, not free from risk and danger.  Not only did libelants act as firemen in extinguishing the fire, but in order to do so effectively it was necessary to discharge hundreds of bales of cotton, which discharging was done by them.  Had it been suggested to the firemen at the time of their organizing that they would be called upon to render such services as the present, and be bound to render them gratuitously, how many of them would have joined the force?  Not one, I am satisfied.  However so ready they might be to perform the ordinary duties of a fireman, and to respond to all usual calls, there is not one but would have declined such service as this.

I see no reason in law or justice why the owners of this property could demand, under the circumstances, gratuitous exertions from the firemen in this case, any more than from any other class of persons in the city; and it resolves itself into a question of policy.  In the case of *The Mary Frost* it is remarked that "an attempt to make the performance of this duty a ground of salvage, when it is a ship that takes fire, is against wise policy."  Would it be wise policy to say, by dismissing this libel, that libelants, if they continue their organization and character, have no right of compensation for such services?  That so long as they are firemen they are bound to extinguish the fire in the cargo of any vessel arriving in this port, and do so gratuitously, regardless of the circumstances of the case, or time or labor required?  How long would their organization continue in event of a demand for their services in another similar case?  Can it be doubted that the companies would be disbanded, and their position as firemen given up, before accepting such duties and obligations; thus leaving not only vessels on fire which might arrive in this port without means of assistance, but the city also unprotected?  Is it not a wiser policy to declare that it is the province of the courts to accept jurisdiction, and determine the rights between the parties in view of the circumstances surrounding each case, than to declare that before them firemen can have no standing in a salvage suit, either by contract or as salvors?  The danger to commerce in this respect cannot be great, as is plainly shown from the very few cases in which firemen ever assumed to pose as salvors.  This is a class of firemen's work generally performed by private parties, and undertaken by firemen only when no other means is available, or the fire is jeopardizing other property.  The

resolution of the city commissioners, that the city engines and fire department could only be used in this case when no private means could be found sufficient, shows the spirit that pervades city governments in relation to such matters. Were there no means by which rights of firemen could be inquired into in such cases, they would, and not without reason, undoubtedly refuse to render services such as the circumstances show these to have been, when called upon for them. There seems to have been no refusal on the part of the libelants to go to work, nor does it appear that they, or their representatives, were the first to make a demand for compensation. It was only upon the inquiry of the applicants for assistance, and their asking for terms, that any were named. In *The San Juan* it does not appear that any contract, agreement, or terms were demanded, but they accepted what was paid them. The case is so entirely different from *The Mary Frost*, that, while 1 cordially approve the decision in that case, I cannot consider it binding in this. In that case the ship was receiving cargo from the city, had become for the time a portion of its commercial agencies, and identified with its interests. She was lying at a wharf where a conflagration would endanger the city itself. The labor of the firemen occupied but a short time, and was neither extended nor arduous, and just such service as was absolutely necessary for the protection of the city and its property. The same statement would apply in the case of *The Suliote*. In this case every essential element of service is different. The learned justice in the case of *The Mary Frost* says: "The question is whether it is a case for salvage. In my opinion it is not." The same question is now whether *this* is a case for salvage, and I must say that in my opinion it is.

The case of a ship taking fire in a harbor or at a dock, while receiving or discharging cargo, and connected by her business in any way with the interests of the city, or where any portion of the city might be in jeopardy, is not under consideration, and nothing herein said is intended as favoring in any way a salvage claim in such case.

Deciding that this may be considered a salvage service decides that in rendering it the firemen went beyond their ordinary duty as firemen of the city, which disposes of the objection to their suing in their own names, and without the consent of the municipality.

This suit, however, is brought upon a contract, and not for salvage.

A contract for the performance of a salvage service may be sued upon as such, and either declared not proven, or set aside as unreasonable, and salvage declared *eo nomine*. The contract, as alleged in the libel, is not denied in form, but in the construction of its terms. Libelants demand pay for the entire number employed for the entire time engaged in the service, regardless of the number of hours they each actually performed labor. The respondent says such was not the understanding, but that the actual number of hours worked by each one only was to be paid for at that rate. Neither party at that time seems to have known the terms of settlement or the manner of work on the *San Juan*, the case referred to in the alleged agreement. Mr. Fogarty only knew that the underwriters were satisfied with the amount paid, and considered it reasona-

ble. Nothing was said by either party about the number of men to be employed.

While perhaps the rate demanded might not be considered unreasonable, even with the construction placed upon it by the libelants, had only the necessary number of men been employed, the much larger number of men than could be of any service being permitted to join in the work, makes the account unreasonably large. The condition in which the property in regard to which the contract is alleged to have been made, was at the time, as well as the lack of mutuality of understanding between the parties as to its terms and construction, satisfy me that all consideration of it should be put aside, and only a question of salvage *eo nomine* considered. It is impossible to determine the number of hours actually worked, even should the construction of the respondent be accepted as to its terms; and the construction of libelants would give an amount larger than would be considered a reasonable salvage. But it must be considered as a salvage service of low merit. The time occupied and labor performed were considerable, but these constitute but minor elements in such a service. The exposure to personal danger, although something, was not great. The services were only valuable by means of the fire-engines, which have been paid for. The libelants had no property hazarded. They lost no time in going or waiting, as the ordinary licensed wreckers of this district so often do. Yet the property was in great peril, and, so far as has been shown, no other means available. The fire-engines were useless without libelants. The property has been saved and restored to the owners in a comparatively undamaged condition.

In *The Blackwall, supra,* the supreme court approved as a fair salvage 10 per cent. where a vessel on fire in the harbor was extinguished with comparatively little labor and time. In *The Suliote, supra,* the appellate court allowed 8 per cent., or nearly $20,000, on a value probably not equaling that in this case. In the case of *The Prairie Bird,* arriving June, 1875, in this port with a cotton cargo on fire, much in condition of the vessel in the case at bar, although perhaps in some respects the danger was greater, she being a wooden ship, with no bulk-heads, $14,000 was given on a valuation of about $100,000. Ad. Rec. S. D. Fla. vol. 11, p. 78. In the case of *The Albert Gallatin,* which took fire with a cargo of cotton in Mobile bay in April, 1868, on a value of $346,000, saved by steamers and tug-boats, there was allowed a salvage of more than $84,000, or about 25 per cent.; and on the Thalia and cargo, also on fire the same month, in the same district, over $32,000 was given on a value of $113,000 saved. Ad. Rec. S. D. Fla. 1868. In *The Cyclone,* 16 Fed. Rep. 486, 15 per cent. on the vessel and 25 per cent. on the cargo was given for extinguishing fire on a ship laden with naphtha. In *The Lone Star,* 35 Fed. Rep. 793, $8,350 was given for partially saving the vessel, when the amount actually saved was estimated at from $22,000 to $29,000. In *The Florida* and *The Howard Drake,* where the salvors had no property at risk, and were occupied but about three hours, 6 per cent. was deemed a proper salvage to the libelants, although a portion

of the salvors had been paid by the owners. 22 Fed. Rep. 617. In *The Bay of Naples, ante,* 90, (recently decided by Judge BENEDICT, in the district of New York,) a salvage of $20,000 was given on a valuation of $100,000.

In all of these cases the salvage service was the extinguishing of fire, but the circumstances surrounding each case are so different that none can be treated as a precedent. In this case there has been no statement, allegation, or estimate of the value of the property, but its character, nature, and condition have been testified to, and, for the purpose of determining an award, I consider it may be safely taken at from $275,000 to $300,000. Such approximate valuation will be sufficiently near, as it is not necessary to give a certain percentage. I consider $12,000 will be a liberal compensation for the time and labor of the libelants, and not an unreasonable burden upon the property, considering all the circumstances. This, after the payment of their proctor's fees, will leave the libelants a little less than had been considered a reasonable compensation by the master and the agent of underwriters present, and conditionally offered; but, as there was no unqualified offer, and the suit was brought at the suggestion of the representatives of the property, costs will necessarily follow.