THE OMAHA.

THE SOMERS.

THE WILLMOTO, PHILADELPHIA.

No. 6.

District Court, Puerto Rico.

April 30, 1947.

James D. Hill, Sp. Asst. to Atty. Gen., for Tom C. Clark, Atty. Gen. of the U. S. as Successor to the Alien Property Custodian.

Arnold W. Knauth and Henry G. Molina, both of San Juan, P. R., for the claimant Hamburg-American Line.

E. T. Fiddler and Jose G. Gonzalez, both of San Juan, P. R., for Swiss Bank Corporation, Intervenor.

COOPER, District Judge.

On the morning of November 6, 1941, the U.S.S. Omaha and the U.S.S. Somers were on neutrality patrol at approximately longitude 27.47 West and latitude 0.55 North, that is, north of the equator, halfway between the hump of Brazil and the bulge of Africa. A puff of smoke was sighted upon the horizon and the captain of the U.S.S. Omaha stood toward the smoke and later a vessel hove into sight, taking, apparently, evasive courses. She was hailed and, as she gave unsatisfactory answers, she was ordered to heave to.

Thereupon, there was unfolded one of the great dramas of American peacetime seamanship.

The puff of smoke turned out to be a merchantman displaying American colors and the name "Willmoto, Philadelphia," on her stern. General Quarters had been sounded aboard the Omaha. A boarding party was organized under the immediate command of George Kennedy Carmichael, Lieutenant U. S. Navy. The boarding party was called away and got into a motor whale boat and proceeded, after having been lowered, towards the ship displaying the name "Willmoto." Shortly before the whale boat bearing the boarding party arrived alongside the purported Willmoto, in fact the Odenwald, she, the Willmoto, hoisted an international flag signal "Fox-Mike" meaning "I am sinking. Send boats for passengers and crews."

Upon approaching the Odenwald and her lowered boats, the boarding party heard some explosives detonating within the Odenwald. One of the company of the M. S. Odenwald observed to the leader of the boarding party as follows: "this is a

Philip F. Herrick, U. S. Atty., and Pascual A. Rivera, Asst. U. S. Atty., both of San Juan, P. R., and Thomas McGovern, Department of Justice, of Washington, D. C., for the United States.

German ship and she is sinking." The boarding party thereupon went up the ladder, the Commander and Coronado, a witness herein being armed with pistols and a few others of the party with automatic weapons. They found that only one generator was actually operating, certain watertight doors, valves and manholes were open, and that the sea water was invading the afterpart of the Odenwald. In an attempt to find the origin of the leakage that was apparent, one of the party, Mr. King who at that time was a Navy diver, descended into the Atlantic and investigated. Sharks appeared, and the other members of the party shot at the sharks in a vain attempt to drive them away. Mr. King was unable to find the breach and therefore, returned aboard and thereafter rendered valuable service in connection with the salvage of this vessel. Many open cans of benzine were found by Coronado, a witness in the cause, who later was appointed Master-at-arms, as well as certain boxes which, he stated, emitted a ticking sound. These boxes, as well as the cans of benzine, were consigned to the sea. It was necessary to go into the shaft tunnel and the bilges of the M. S. Odenwald at a great hazard. It was necessary for the party to exhibit great skill and courage in order to make this vessel navigable. Suffice it to say here that she was tender as a result of the flooding of her holds and that at any time she might well have sunk. So true is this that one of the Germans, her Master, in fact, said "This ship will list to starboard, and then she will list to port and then she will sink." The record furnishes further details of the work performed by these gallant men, who overcoming difficulties that the Odenwald's own crew thought were insurmountable (they had deliberately planned it to be so) salved this ship which with its cargo, within a month and a day was to become so valuable to our cause.[1]

After eleven days in which the sixty-seven members of the crew of the Omaha who were in charge of the Odenwald subsisted on scanty rations, she, who at all times was exposed to attack by German submarines, arrived at the vicinity of Port-of-Spain, Trinidad. Thence she came to San Juan, Puerto Rico, and thus ended the Odyssey of the courageous, skillful, and successful salvors of the Odenwald.

■ We now come to the questions of law raised by libellant and claimant. With respect to the contention that there is no Res presently before the Court, the orders heretofore entered clearly show that the Court was not relinquishing the Res inasmuch as the Court specifically retained jurisdiction of the proceedings insofar as the hull is concerned and with respect to the cargo the orders show that jurisdiction was retained. The long time which has elapsed since the libel was filed does not reflect a vacuum as claimant for Hamburg contends because that period was lengthy only due to the fact that the United States and the German Reich were at war, and under the decision of Mr. Justice Brandeis in Watts, Watts & Co. v. Unione Austriaca di Navigazione, 248 U.S. 9, 22, 39 S.Ct. 1, 63 L.Ed. 100, 3 A.L.R. 323, it was necessary to allow the cause to remain dormant until the end of hostilities. Although it is true that the Odenwald had committed no wrong against the United States except the display of American colors on a foreign vessel (22 U.S.C. A. § 454), a maritime lien for salvage attached to her upon her being salved by the people of the Omaha and Somers and they had the right to bring her into the nearest port.

■ We next come to the question of whether salvage can be forced on the unwilling. The Master of a ship is in a peculiar position. He represents not only the owners of the ship but is also the agent by necessity of the underwriters, the mortgagees, those who have ventured to accept an hypothecation of her as well as the owners of her cargo. They are entitled to know that the Master is serving their interest as well as the interest of their owners and as a matter of law, he, the Master represents them. It may be that the Hamburg Line and through it the Government of the German Reich authorized the scuttling of the Odenwald 'alias Willmoto.

---

[1] See "The Blackwall" U. S.

---

However, the Master was not by that authorization entitled to sink her, ignoring thus, the rights of the intervenor, a Swiss mortgagee and the rights of the unknown owners of her cargo.

The Odenwald was not in possession of her people when the boarding party from the Omaha took her over. She was then a derelict. She had been abandoned by her Master and her crew. The testimony is clear to the effect that her own captain was of the opinion that she was going to sink "within 20 minutes" and for that reason they had abandoned her.[2]

There is nothing in the law forbidding collection of salvage by the United States. It is true that it is very seldom claimed but this is merely self denial on the part of the Government and it does not preclude salvage award to the United States.

This is not a case of bounty or prize, inasmuch as the United States of America on November 6, 1941, was not at war with Germany. Therefore 30 Stat. 1004, 1007, does not apply as the boarding party boarded the Odenwald at a time when she was not an enemy.

In connection with the question of Wilhelm Sidell it appears that upon the occasion the boarding party was attempting to start the engines of this vessel and thus to salve her, Willie Sidell, one of the Odenwald's crew indicated by manual gesticulation that a certain flywheel necessary to the starting of the engine was not being spun with sufficient rapidity. This, under the testimony, was not the effort of a man interested in salving his own ship, but rather the instinctive gesture of an engineer who is unwilling to stand by and permit familiar machinery to be mishandled. Therefore, the contention that the M.S. Odenwald was salved by a member of her crew and not by the personnel of the U.S. S. Omaha and U.S.S. Somers cannot be sustained.

The observations of learned proctor for claimant Hamburg American Line in his trial brief with respect to the Fox Mike signal hoisted by the M.S. Odenwald are interesting but the contention they support, in my opinion, is unsound.

We next come to the question—always difficult in cases of this nature—of the actual salvage to be paid. The value of the ship and cargo which were preserved amount to the large figure of approximately three million dollars ($3,000,000). Persons[3] acquainted with salvage agree that where the figures are so large it is only necessary that an approximate figure be presented. Using this figure as a guide I have not attempted to apply any percentages out of which to make a fund wherewith to apportion the individual salvage due. It seems to me simpler and more appropriate to allow an award to these intrepid, able and successful men and the United States, the amounts which I now set forth to wit:

| | |
|---|---|
| Each member of the boarding and salvage party | $ 3,000.00 |
| The United States, as owner of the U.S.S. Omaha and U.S. S. Somers for the expenses of the salvage | 42,212.40 |
| The United States, as owner of the U.S.S. Omaha and U.S.S. Somers | 30,000.00 |
| To each member of the crew of the U.S.S. Omaha and U. S.S. Somers, who were not aboard the Odenwald ... 2 months pay and allowances, amounting in the aggregate.. | 124,211.66 |

Either party in this proceeding may ask for modification of this decree and the Court retains jurisdiction for that purpose.

### Findings of Fact and Conclusions of Law.

This case having been heard on the pleadings and proofs adduced by the respective

---

[2] The Richmond, 2 Cir., 219 F. 714, and New Harbor Co. v. Steamer Charles P. Chouteau, D.C., 5 F. 463, quoted by the learned Proctor for claimant Hamburg American Line, are distinguishable from the Odenwald as they involved vessels whose Masters rejected aid. The Odenwald's Master had abandoned her. She was at the time of these events, a derelict.

[3] The "San Demetrio." Admiralty Division, Lloyd's List Law Reports, Jan. 16 and 71, 1941, Vol. 69–5.

parties and having been duly argued by their respective advocates, and the Court having filed its opinion in writing, the Court hereby makes the following Findings of Fact and Conclusions of Law:

## Findings of Fact.

I. On the 6th of November, 1941, the U.S.S. Omaha and the U.S.S. Somers while on neutrality patrol at approximately Longitude 27.47 West and Latitude .55 North, sighted the motor ship Odenwald alias Willmoto.

II. The M.S. Odenwald hoisted an international flag signal meaning: "I am sinking, send boats for passengers and crew."

III. A boarding party was called away and upon coming alongside the M.S. Odenwald found that all of her company were in boats and had abandoned the said ship. They also heard some detonations within the Odenwald.

IV. An inspection of the vessel by the boarding party revealed numerous leakages, open benzine cans, packages apparently containing bombs, and as a matter of fact, the vessel was listing badly and her Master warned the boarding party that she was about to sink.

V. The boarding party from the Omaha set about repairing the considerable damage which had been caused the Odenwald by her own crew following the orders of her Master. I find as a matter of fact that the officers and crew of the Odenwald had attempted to scuttle their own ship after which they abandoned her.

VI. The boarding party from the Omaha was successful in controlling and repairing the damage to the Odenwald and in this task they displayed great skill, resourcefulness and courage, and I find, as a matter of fact, that had it not been for the efforts of the members of the boarding party, the Odenwald would have sunk. At all times during these operations, as well as during the subsequent voyage to San Juan, Puerto Rico, the Odenwald as well as the U.S.S. Omaha and the U.S.S. Somers were in imminent peril of attack by German submarines.

VII. In repairing the damage to the Odenwald and getting her under way, the boarding party from the U.S.S. Omaha received no cooperation whatsoever from the officers and crew of the Odenwald.

VIII. The Odenwald made San Juan, Puerto Rico, eleven days after the salvage operations commenced.

IX. I find that the value of the Odenwald was the sum of $500,000 and the value of her cargo $1,860,000.

X. I find that the cost to the United States of America of the salvage operations amounted to the sum of $42,212.40.

## Conclusions of Law.

1. The Court acquired jurisdiction in rem of this cause and has always retained jurisdiction of the Odenwald and her cargo.

2. A maritime lien for salvage in favor of the libelants attached to the Odenwald and her cargo by reason of her salvage by the boarding party from the Omaha.

3. The Odenwald at the time she was boarded by the people from the Omaha was a derelict.

4. The Master of the Odenwald could not lawfully scuttle his vessel.

5. As a matter of law, the United States is entitled as owner of the two men of war involved in this case to collect salvage and the officers and members of the crews of the U.S.S. Omaha and U.S.S. Somers are also entitled to collect salvage.

6. This is not a case of bounty or prize.

7. The libelants are entitled to collect salvage in the aggregate sum of $397,424.06 with costs and expenses.