### THORNTON v. THE LIVINGSTON ROE et al.

United States District Court
S. D. New York.
March 31, 1950.

Burlingham, Veeder, Clark & Hupper, New York City (Eugene Underwood, New York City, advocate), proctors for libelant.

Kirlin, Campbell, Hickox & Keating, New York City (Raymond T. Greene, New-

York City, advocate), proctors for respondent-claimant.

MEDINA, District Judge.

Libelant William M. Thornton claims salvage by reason of certain operations conducted under his supervision and with his personal participation, as a result of which the S S Livingston Roe was saved from destruction by fire in the Port of Recife, Brazil, on May 2, 1943.

At that time Recife was one of the several foreign ports which the United States Armed Forces used to maintain avenues of communication and supply between the Americas and the European Theatre of Operations. It was the headquarters and center of operations of the United States Fourth Fleet, which was responsible for keeping the South Atlantic area clear of the enemy. It was also the headquarters of the Allies in the South Atlantic and of Admiral Jonas H. Ingram, then Vice-Admiral, who was both Commander of the Fourth Fleet and Commander of the Allies in the South Atlantic.

At that time enemy submarines and blockade runners presented a serious problem. To keep the South Atlantic area clear of the enemy, the Fourth Fleet used a large air force and engaged in extensive convoy operations. Much of the supply and repair work involved in these operations was done in Recife, thus avoiding the necessity of sending ships to Navy yards in the United States for repairs. A Naval Operating Base in Recife, which contained shore-based repair shops, was under Admiral Ingram's command, and supplies for air as well as sea forces were there received and made available.

The Port was under the technical command of Brazilian authorities, but was in fact under the actual control and direction of Admiral Ingram and his staff, by reason of his position as Commander of the Fourth Fleet and Commander of the Allies in the South Atlantic.

Libelant was, in May 1943, a Commander in the United States Navy stationed at Recife, a member of Admiral Ingram's staff and directly responsible to him. He was Materiel Officer of the Fourth Fleet and Commander of shore-based repair shops. As he testified, his duties included the maintenance "of the ships of the Fourth Fleet in operating condition at all times." In addition, he was charged with responsibility for the preservation of shore-based facilities which were used in caring for such ships. There was no salvage officer at Recife in May 1943, but Thornton had volunteered for at least nine salvage operations before the one involved here, and these he carried out with noteworthy success.

The Livingston Roe is a tanker which the respondent Standard Oil Company of New Jersey owned on May 2, 1943, but which the claimant Panama Transport Company owned at the time of trial. When the Livingston Roe came south of 10° North Latitude, she was under the protection of Admiral Ingram and he was responsible for her safety. When she arrived at Recife about April 30, 1943, she was under charter to the United States and carried a cargo of 25,450 barrels of motor gasoline consigned to the Standard Oil Company of Brazil, and of 63,813 barrels of high-octane aviation gasoline consigned to the United States Army. She was berthed alongside Armazem (Warehouse) 2, less than 200 yards from the repair shops which Thornton commanded. Armazem 2 was filled with paints and ammunition, and Armazem 1 adjacent thereto, to the north, contained Army supplies including explosives. The Cruiser U. S. S. Milwaukee was moored to the south alongside Armazem 3. Still further to the south were the Cruiser U. S. S. Memphis, other smaller ships of the United States Navy, and the Brazilian Battleship Sao Paulo. Oil storage tanks were on the inner side of Armazem 1.

On the morning of May 2, 1943, the Livingston Roe was discharging aviation gasoline through a hose overside. Suddenly the hose burst, probably because the valve at the receiving tank ashore was closed before the pump on shipboard was shut off, and the resulting increase of pressure in the hose was more than the fabric could withstand. Before the pump aboard the Livingston Roe could be stopped, the warehouse door, the dock, gasoline drums on the

dock, and part of the ship itself were sprayed with gasoline.

The gasoline vapors exploded when a wood-burning donkey locomotive approached the area on a narrow gauge track, which runs along the wharf between the ships and the warehouses. The wharf caught fire, as did the Livingston Roe a few minutes later. The crew abandoned ship, fearing that the warehouse, which was filled with ammunition, would explode. Later, the chief engineer reboarded the Livingston Roe and opened the steam smothering valve, which admitted steam into all the cargo tanks and displaced the air above the surface of the gasoline, thus diminishing the danger of an explosion. He found a party of Navy personnel on board. They released the ship's stern anchor (ships in Recife Harbor put out two anchors because of the prevailing onshore wind). The chief engineer and the Navy personnel left in a Navy boat after the Livingston Roe had caught fire amidships.

At about 10:15 a. m. Thorton was notified of the fire and immediately went to the wharf. There he took various steps designed so save threatened government property, including having the U. S. S. Milwaukee pulled into the middle of the bay by a Brazilian tug. He directed firefighting operations from the wharf.

A Brazilian tug, the Cabedelo, on order of the Brazilian Port Commander fastened onto the Livingston Roe and began to pull her out into the bay. Thornton, after conferring with a higher ranking officer who had arrived on the scene, of his own volition boarded a Navy boat, which took him out on the bay where he transferred to the tug Fourth October. Thornton prevailed upon the captain of the Fourth October to approach the Livingston Roe in order to fight the fire which was burning fiercely in several places. The Fourth October used its fire nozzle to good advantage in knocking down the heavy flames. The tug then flooded the forward deck of the Livingston Roe to keep the tank tops cool.

At about 12:15 p. m. Navy men in another boat cut the Livingston Roe's other anchor chain on Thornton's orders, and the Cabedelo began to tow her away from the docks. The Brazilian Port Commander aboard the Cabedelo had intended to take the Livingston Roe out to sea and abandon her there to her fate, but Thornton prevailed upon him to beach her at the north breakwater as far from the wharves as possible. Thornton continued to direct the firefighting while the Livingston Roe was being towed. When she was beached on a reef inside the breakwater, Thornton boarded her. Fire parties from Navy ships also boarded. This was about 2:30 p. m.

Once aboard, Thornton continued to direct the firefighting. At about 4:00 p. m. the fire was well under control, and men were sent below to get up steam in the boilers. Thornton left the ship at 2:30 a. m. the next morning, after the fire had been completely extinguished. The Livingston Roe had her steam up, her lights and fire pumps working, had been pulled off the reef, and had her own crew aboard. The airplane gasoline aboard her was safe, and she was available for further tankage services.

It is clear that if the Livingston Roe had exploded, the war effort in the South Atlantic area would have been grievously affected. The Port of Recife could very well have been wiped out. The loss of the Livingston Roe and her cargo of aviation gasoline alone would have been serious in the light of the limited supply of tankers and gasoline which were at that time available and the great demand for both in connection with the air operations of the Fourth Fleet and attached units.

Thornton was promoted to the rank of Captain and awarded the Navy and Marine Corps medal for his fire-fighting activities.

■ Salvage is the compensation which the law directs the owner of a ship to pay to persons who voluntarily assist in saving the ship or its equipment from impending peril. See 1 Benedict, Admiralty 333-34 (6th ed. 1940). There is no doubt that libelant performed beneficial services to the Livingston Roe when she was in peril, and the pivotal question is whether libelant is disqualified to receive a salvage award because he acted in the performance of his duty as a naval officer of the United States.

Clarity of analysis will be served if I first dispose of the confusion which arises from the relationship of two similar but separate and co-existing rules of law.

■ One rule denies recovery for salvage services if the claimant is under a duty to the salved ship to render the services. The Clarita and The Clara, 1874, 23 Wall. 1, 17, 23 L.Ed. 146, 150; 1 Benedict, Admiralty 335 (6th ed. 1940); The Sarpen, [1916] P. 306, (C.A.); Williamson v. The Alphonso, C.C.Mass. 1853, 30 Fed.Cas. page 4, No. 17, 749; The New Orleans, C. C.E.D.La. 1885, 23 F. 909. Naval personnel, performing salvage services under the control and authority of their superiors are not denied recovery under this rule. Cf. The Amistad, 1841, 15 Pet. 518, 597, 10 L.Ed. 826 and The Omaha, D. C. Puerto Rico 1947, 71 F.Supp. 314, affirmed sub nom Hamburg-American Line v. United States, 1 Cir., 1948, 168 F.2d 47.

■ The other rule may be aptly described as a public duty disqualification, which may be applicable even in a case where there is no duty to the ship. It is this rule which bars recovery to libelant. Courts have long held that public officers who render salvage services to individuals in the course of performing their public duties may not be awarded salvage. Firemen's Charitable Ass'n v. Ross, 5 Cir., 1893, 60 F. 456; Davey v. The Mary Frost, C.C.E.D.Tex. 1876, 7 Fed.Cas. page 14, No. 3,592; The Belle, Edw. 66, 165 Eng.Rep. 1034 (Adm. 1809); The Aquila, 1 C.Rob. 37, 165 Eng.Rep. 87 (Adm. 1798); see Le Tigre, C.C.D.N.J., 1820, 15 Fed.Cas. pages 404, 405, No. 8,281. This disqualification does not encompass all salvage services rendered by public officers. Analysis of the cases indicates that it is applicable when the salvage services are in the circumstances within the scope of the duties enjoined by laws, regulations and directives, or within the scope of those duties implied from the nature of the particular public service involved. In other words, the question is whether the operation for which salvage is claimed is one which the individual or group was expected to perform as a result of his or its public status.

Thus in Firemen's Charitable Ass'n v. Ross, supra; Davey v. The Mary Frost, supra; The Belle, supra, and The Aquila, supra, the salvage services were within the scope of the duties enjoined upon the public services of which the claimants were members. Salvage was denied in each case.

On the other hand, the services rendered by the crew of the Omaha, i. e., saving a foreign merchant ship which had been scuttled by its own crew when the United States was at peace, were not within the scope of the duties which the Omaha or the Navy was chargeable with performing, and salvage was awarded to the individuals involved. Similarly, the claimants in The Amistad, supra; Bowers v. The European, D.C.S.D.Fla., 1890, 44 F. 484; The Huntsville, D.C.E.D.S.C. 1860, 12 Fed.Cas. page 996, No. 6,916; Le Tigre, supra. The F. D. Lambert [1917] P. 232. And The Mars and Other Barges, 81 Ll. L. L. Rep. 452 (P. 1948) were not performing acts within the scope of the duties of the public services of which they were members, and salvage was awarded.

It is argued by counsel for libelant that there is no such public duty disqualification according to the English precedents and that courts have often stressed the importance of establishing and maintaining a harmonious body of maritime law, especially as concerns American and English adjudications. But it is far from clear that libelant would succeed even if the English cases were controlling. The Svanfos, [1919] P. 189; The Gorliz, [1917] P. 233; Silver Bullion, 2 Sp. Ecc. & Ad. 70, 164 Eng.Rep. 312 (Adm. 1854); The Rapid, 3 Hagg. 419, 166 Eng.Rep. 460 (Adm. 1838); The Clifton, 3 Hagg. 117, 166 Eng.Rep. 349 (Adm. 1834); The Mary Ann, 1 Hagg. 158, 166 Eng.Rep. 57 (Adm. 1823).

There are ample and, indeed, compelling reasons of policy which support the public duty disqualification. As was said in Le Tigre, supra, 15 Fed.Cas. at page 405: "When the service for which the compensation is claimed by a public officer, is required of him by the law, virtute officii; or it becomes a duty, necessarily connected with his public employment; we can per-

ceive the most obvious reason, why a compensation beyond what the law allows, should not be claimed from the owner of the property saved. For services thus required, he is paid by the public, in the emoluments to which his office entitles him; and this the law may justly consider as a full equivalent. He deserves, and ought to receive no other reward, from the person for whose interest he acted; for, although the individual receives the benefit, the service is in reality rendered to the government, and not to the individual."

Moreover, the devotion to duty of a public official and the exercise by him of the judgment and discretion necessary to the performance of the functions of his office should not be tainted or in any way affected by the hope of private reward.

The only questions remaining are whether the services rendered were within the scope of the duties of the public service of which Thornton was a member, and whether he did what he did as a member of that service. This will depend on the facts of the case, and so I turn to them.

It may well be that the services performed by libeland those acting under his orders prevented the destruction of the Port of Recife. At the very least it is established by the proofs that he and those who assisted him saved both the Livingston Roe and her cargo for future use by the naval and air forces. Destruction of the Port would have severely hampered the Allied war effort, and would have impeded, if not prevented, the Navy from performing its assigned function in the South Atlantic area. It was clearly within the scope of the Navy's duty to do whatever was necessary to enable it to continue to operate in that area, and it was accordingly within the ambit of its duties to preserve the Port of Recife from destruction. In addition, it was within the scope of its obligations in the grave emergency which the fire constituted to do all that was possible to save the Livingston Roe, its cargo, and the supplies which were threatened.

No specific directives to that effect need be relied upon to justify the conclusion reached. In times of war grave emergen-cies such as the one that existed in this case arise all too frequently. When they do, it is perfectly obvious that the duty of the armed forces there present is to meet the danger, to combat it, and if possible to overcome it. That duty arises from the fact that the armed forces have been assigned a mission and the emergency threatens the success of the mission. The fact that Recife Harbor was not under enemy fire does not induce me to feel that strenuous and heroic services required there are to be regarded differently from such services on more active fronts. As far as its importance to the war effort is concerned, not every engagement with the enemy ranks higher than the salvage of the Livingston Roe.

Everything done by Thornton was done as a naval officer and was within the scope of the duties enjoined upon the Navy. Thornton, as a high-ranking officer, was cognizant of the nature of the emergency, as his report to Admiral Ingram and testimony at the trial attest. Facilitating the Livingston Roe's withdrawal from the wharf, directing and participating in fire-fighting operations ashore and afloat, and saving the Livingston Roe and her cargo from destruction, were acts performed to achieve the safety of the harbor, to save the gasoline aboard the Livingston Roe, which was consigned to and urgently needed by the Allied forces at Recife, and to preserve the Livingston Roe for future transportation services at a time when tankers were few and badly needed by the Armed Forces.

The obligation and duty which rested upon Thornton, and upon all members of the Armed Forces of the United States there present, was to do whatever he was capable of doing which he believed would be helpful in the emergency. That Thornton was able to do so much is to his everlasting credit, but it must be remembered that as a high-ranking officer much was properly to be expected of him.

█ The objections to evidence, which were reserved for further consideration after the filing of briefs, do not appear to be substantial and I adhere to the rulings made at the trial. Judge Knox confirms what I

inferred from the file to be the case, namely, that the statement directed by his order to be obtained from the Navy was to be proffered as evidence at the trial, and not merely to facilitate further investigation. Much of the statement has been disregarded by me as conjectural and otherwise inadmissible. Sufficient remains, coupled with the testimony of Admiral Ingram, to convince me that it was the duty of the Navy to act in the premises and that what Thornton did he did in the performance of his duty as a naval officer. Indeed, the circumstances would seem to compel such a finding even if no such direct proof were at hand. The fact that no further written orders were forthcoming is not surprising; and it is fair to assume that none could be found, despite reasonable and diligent search therefor.

I conclude that the salvage services were within the scope of the duties enjoined upon the Navy of which libelant was a high ranking officer, and that he performed those services in that capacity and pursuant to such duties. Accordingly, libelant is disqualified to receive a salvage award. The other questions discussed in argument and in the briefs seem to require no further comment.

Libel dismissed. Submit findings.