**SPIVAK v. UNITED STATES et al.**

No. 10936.

United States Court of Appeals
Third Circuit.

Argued April 9, 1953.

Decided May 1, 1953.

Charles Lakatos, Philadelphia, Pa., (Joseph Weiner, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellant.

Thomas E. Byrne, Jr., Philadelphia, Pa., (Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for appellee.

Before MARIS, GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

This libel which involves a claim for salvage services was dismissed on respondent's motion by the district judge at the trial below and libellant appeals.

In August, 1947, libellant was a civilian employee of the United States War Department. His original written contract of hire as master [1] was with the United States of America and dated at New Orleans October 25, 1945. By the agreement his base pay was fixed at $6,036 per annum. That same day he was transferred to the Pacific Theatre of Operations. According to Spivak he signed another employment contract at San Francisco in November, 1946, "* * * to go as master, Pacific," and thereafter went to Korea. That alleged contract is not in evidence. In any event on April 3, 1947, he was definitely a civilian employee of the War Department, Department of Transportation. His title was that of master and his base pay $5,528 per annum plus applicable marine allowances. His duty station was Pusan, Korea. On that date he was reassigned and promoted within the Department of Transportation to "Advisor (Korean Merchant Marine)" with his salary fixed at $7,381.50 (including 25% O/S Diff.). His duty station and its location remained the same. He was paid by the War Depart-

1. Libellant testified that he had been going to sea since 1904 and had held a master's license since 1920.

ment and was under the Chief of the Marine Bureau, Col. Nelson. Spivak stated that after he had quarreled with the particular subordinate officer to Col. Nelson who assumedly had been giving him orders, a civilian War Department employee named McCarty " * * * was put in charge over him."

On August 15, 1947, the S. S. "George S. Boutwell", en route from San Francisco to Pusan, struck a reef near Sashu Island off the Korean coast. The "Boutwell" was owned by the United States and operated by Sudden & Christenson, Inc. as bareboat charterer. It was carrying a Government cargo intended for the army in Korea. Spivak said that McCarty in Pusan, upon receiving word of the situation and request for help, asked him to take a ship, go to Sashu, look for the "Boutwell" and report back to him as to " * * * whether we could do anything about getting her off." Spivak states that he insisted instead on going to Sashu with 100 men and the necessary equipment to " * * * go to work and get her off" and that the port commander, Col. Lipset, agreed to his idea. He then obtained a landing craft which was flying the Korean flag and from the Korean Steamship Company "who was acting as agent" procured the crew and about 100 laborers. The company also supplied the necessary rations.[2] Spivak said that he rounded up the various ship's officers and shortly thereafter in the landing craft KBM–2 they all left for Sashu. After arriving at the "Boutwell" Spivak conferred with her master, Captain Carlson, a civilian steamship representative and an army captain. The latter two, according to him, had come out from Pusan with him. He states that he suggested that forward hold cargo of the "Boutwell" be removed while they were planning what else to do in order to float the ship. This was done and, according to Spivak, some helpful arrange-

ment of anchors which he also suggested was adopted. Spivak in the KBM–2 was alongside the "Boutwell" about three days during which time some cargo was transferred from her to the KBM–2, though Spivak states the KBM–2 " * * * could have still taken more cargo."[3] On the night of August 20, 1947, though the "Boutwell" had not been floated, Spivak in the KBM–2 started back for Pusan. He left Captain Carlson so early because he "got sore" at him. He did not deny that his reason for leaving was that he " * * * had so many disagreements with Captain Carlson, Mr. Nicholson (the civilian representative) and Mr. Kelpe (the Army captain)."

At the oral argument it was conceded by counsel for appellant that the latter had no claim against appellee Sudden & Christenson, Inc. arising out of the present action.

The district judge found that Spivak's attempt to salve the "Boutwell" was " * * in the performance of his duties and pursuant to orders given him by his superiors." He also held that his service to the "Boutwell" was not "voluntary".

Since Spivak makes no claim of an express contract of salvage, if he is to recover it must be for " * * * the service which volunteer adventurers spontaneously render to the owners in the recovery of property from loss or damage at sea under the responsibility of making restitution and with a lien for their reward." The Clarita and The Clara, 23 Wall. 1, 90 U.S. 1, 23 L.Ed. 146, 150; and see Benedict on Admiralty, 6th Ed., p. 334; 3 Kent Comm., 13th Ed., p. 245.

It is asserted on his behalf that his service was not a matter of duty, but, as we see it, the record strongly supports the trial judge in his conclusion that Spivak's assignment to assist the "Boutwell" was within the reasonable range of his position with the War Department. That

2. Spivak made it very clear that the Korean Merchant Marine was under the jurisdiction of the United States War Department and that the latter " * * * footed the bills".

3. It is true though unimportant in the circumstances that testimony as to some

of the details of the actual work of the KBM–2 under Spivak to help the "Boutwell" may have been omitted at the trial in line with the comment of the district judge that he was concerned at that time in Spivak's *right* to collect on his salvage claim.

conclusion is in no way affected by the fact that Spivak's employer was also the owner of the "Boutwell". That of itself would not prevent his recovery in this cause. Salvage Act of August 1, 1912, c. 268, Sec. 1, 37 Stat. 242, 46 U.S.C.A. § 727; Kovell v. Portland Tug & Barge Co., 9 Cir., 1948, 171 F.2d 749; Burke v. United States, D.C.S.D.N.Y.1951, 96 F.Supp. 335. What does effectually prevent such recovery is that Spivak in proceeding to the relief of the stranded "Boutwell" was acting under proper orders of his superiors within the scope of his employment. Throughout the entire episode he, under the War Department order of April 3, 1947, was a civilian employee of its Department of Transportation. He had been made Advisor to the Korean Merchant Marine, but there is no indication that he was thereby relieved from his contract obligation to the War Department. He testified that his superior was the Chief of the Marine Bureau; that he took his orders from the subordinates of that officer; that on August 15, 1947, the particular person who had been put over him was the civilian, McCarty. When he disagreed, as he claims, with the limitations of McCarty's instructions he went to the officer above McCarty—the Port Commander—who, he asserts, backed him up on his proposal to take the necessary men and equipment to help the "Boutwell" immediately without first reporting back. Those men, the KBM–2 crew and he, too, all received their regular pay from the United States, directly or through a Korean source, for the time they were engaged with the "Boutwell".

Appellant stresses an exhibit in the case which outlines certain responsibilities of a proposed position of "Custodian of Vessels." That paper does say that the "[i]ncumbent is responsible for the effective and safe operation of all United States vessels purchased by Korea for use in the Korean Merchant Marine." It also states that he "[r]eceives very general supervision, acting almost wholly on his own initiative. For administrative and organizational purposes, is directly responsible to the Port Superintendent, Port of Pusan." If that paper had applied to Spivak on August 15, 1947, it is entirely consistent with his action in going out to the distressed "Boutwell" as a civilian marine employee of the War Department's transportation division. Admittedly, the Chief of the Marine Bureau was his superior. From him, through McCarty, he received his orders. These, according to him, were modified at his request to conform to his own ideas by the Port Commander and he proceeded forthwith to execute them. It happens that the exhibit, even if it could be construed as upholding appellant's contention, is incompetent for that purpose because the record clearly shows that the position of Custodian of Vessels, if it was ever created, was never given Spivak. The job description was attached to a request for the establishment of such position and that Spivak be transferred to it. A note to him of March 3, 1947, from a clerk in the office which forwarded the request, advised him of what was being done and said: "Your job description will go into G–1 today. However, it may take some time before final action is taken. Until the job is finally allocated by XXIV Corps, Civilian Personnel Office, you will still be in the position of Port Captain, at your present rate. We will keep you posted." On April 3, 1947, a month later, he was appointed "Advisor (Korean Merchant Marine)"—not Custodian of Vessels. There is no job description of "Advisor" in evidence nor was there any contention that a description of that position was ever in existence. However, the organization unit within which the position was created was specifically identified in the order as the "Dept. of Transportation."

Spivak had been hired originally as a ship's master. On August 15, 1947, he had completed over forty years of sea service. He was receiving over $7,000 a year in salary alone. He was an important executive member of a War Department transportation program in an area that later developed as the Korean war zone. He was under the over-all authority of the Marine Bureau office which seems to have included the Pusan Port Command. His order to go to the aid of the "Boutwell" emanated from that source. The object

of the order was the protection of the property of his employer and, of course, of the "Boutwell's" personnel, though we are not here concerned with the latter element. He was ideally fitted by experience to handle that assignment. He received his usual salary and sustenance while so assigned, and if he had been injured during the operation would undoubtedly have come within the Federal Employees' Compensation Act. What he did offered little difficulty to a skilled mariner and was in fact readily accomplished. The district judge was completely justified from the evidence in finding, as he did, that Spivak's effort in connection with the "Boutwell" was within the scope of his employment and that he did not act therein as a volunteer.

The judgment of the district court will be affirmed.