Joseph W. NOLAN, Charles O. Keagy, Jr., Earl F. Wingert, Ralph W. Belmore, William D. Eveland, James K. Stellos, Charles W. Snyder, Thomas H. Grissom, Frank C. Richardson, Walter E. Shannon, Jr., Bernard M. Baldomar, Virgil W. Keith, Charles F. Bartlett

v.

A. H. BASSE REDERI AKTIESELSKAB and Pennsylvania Salt Manufacturing Co., Inc.

Charles BARRETT, Master of THE MST LST 287, on his own behalf and on behalf of her Officers and Crew

v.

A. H. BASSE REDERI AKTIESELSKAB and Pennsylvania Salt Manufacturing Co., Inc.

Nos. 399 of 1954, 31 of 1955.

United States District Court
E. D. Pennsylvania.
April 8, 1958.

Joseph Weiner, of Freedman, Landy & Lorry, Philadelphia, Pa., for petitioner Joseph Nolan and others.

Eugene R. Lippman, of Krusen, Evans & Shaw, Philadelphia, Pa., for Charles Barrett.

J. Welles Henderson, of Rawle & Henderson, Philadelphia, Pa., for Penna. Salt Mfg. Co. and A. H. Basse Rederi Aktieselskab.

KIRKPATRICK, Chief Judge.

During the night of August 18–19, 1953, the Danish steamship Else Basse, with a cargo of cryolite ore, caught fire and was abandoned by her master and crew at a point in the Gulf of St. Lawrence some 50 miles from Harmon U. S. Air Force Base on St. George's Bay, Newfoundland. Two United States Government vessels cooperated in putting out the fire and in bringing the ship safely into port. These two actions in admiralty, consolidated for trial, are claims for salvage made by the masters and crews of their respective vessels, the Government having waived its claim as owner of the vessels engaged, and having given permission to the claimants to sue in their own right. The claims are against the cargo only, the ship being beyond the reach of process of this Court.

The fire on the Else Basse broke out at about 9:30 P.M. in the midship portion of the ship. Having got in touch by radio with the steamship Cornerbrook

which was in the neighborhood, the master of the Else Basse, fearing that the fire would cause an explosion in the settling tanks, ordered all hands into the boats and, at 11:55 P.M., left the ship with his officers to join them. They were picked up and brought into port by the Cornerbrook.

Of the two vessels involved in the salvage operation, the first to reach the scene was the Navy LST–287, on its way from Labrador to New York, which sighted the burning ship about 2:40 A.M., arriving an hour later in its vicinity, where she stood by without taking any steps to control the fire until later. The other ship was the Army Tug LT–1953 which was stationed at the Air Force Base harbor. She left the harbor at about 1:20 A.M., reaching the Else Basse at 5:30 A.M. She was equipped with three fire-fighting monitors which could throw streams of water 200 feet or more and she proceeded to play the streams upon the ship, remaining at a distance of 200 feet. The LST's fire-fighting apparatus was much less powerful, and inasmuch as the cargo of the Else Basse was unknown and might have been explosive, neither ship risked coming any closer. By 7:00 o'clock the fire was under control and thought to be extinguished and the ships had learned from the Cornerbrook that the cargo of the Else Basse was merely ore. Two volunteers from the Army tug then jumped from the tug to the Else Basse where they secured a bridle hawser to the bow and then returned to the tug. As the tug started to tow the Else Basse, the fire broke out again, and the LST, having rigged a number of its fire hoses, made fast to the Else Basse and put two fire fighting details aboard her. These men played water on the interior portion of the midship house which was still burning with the result that at about 10:30 the fire was brought sufficiently under control to resume towing. The

Army tug, with the LST made fast and assisting, continued to tow the Else Basse to St. George's Bay where the tow was turned over to the LST which brought her to her anchorage.

The Else Basse was derelict and bringing her into port constituted a salvage operation.

■ The first question is whether the claimants, being officers and crews of public vessels, are barred by what has been referred to as "public duty disqualification".[1] The respondent contends that they are, citing and relying upon Thornton v. The Livingston Roe, D.C., 90 F. Supp. 342, 345, and Spivak v. United States, 3 Cir., 203 F.2d 881. In the former case, the Court stated the rule as follows: "Courts have long held that public officers who render salvage services to individuals in the course of performing their public duties may not be awarded salvage. * * * This disqualification does not encompass all salvage services rendered by public officers. Analysis of the cases indicates that it is applicable when the salvage services are in the circumstances within the scope of the duties enjoined by laws, regulations and directives, or within the scope of those duties implied from the nature of the particular public service involved."

So far as the LST is concerned, there is no serious question but that her services, and consequently those of her personnel, were above and beyond those which they were expected to perform as a result of her and their public employment. There was no legal obligation, and little if any moral obligation, upon her as a naval vessel to go out of her course or to incur any risk in bringing an abandoned and burning derelict into port.

The Army tug stands in a slightly different situation. She was equipped with special fire-fighting facilities and putting

1. The crew of the LST were civilian personnel in government service while the crew of the Army tug were members of the armed services, but in this case the distinction is of no importance.

out fires on other vessels was part of her harbor duties. If the Else Basse had caught fire while in the harbor or while berthed where the Army installations might have been in danger, the tug claimants might well be disqualified, but I do not think that the tug's duties extended to a foreign ship 50 miles at sea, and I think that her crew is entitled to share in the salvage award.

The respondent stresses the "volunteer" character of salvage services rendered as the criterion to determine whether a claimant is entitled to an award and urges that a crew acting under orders may not claim. It is very doubtful whether the Army tug was "ordered" out of the harbor to the Else Basse. However, assuming that she was, I think that that fact is only important as bearing upon the prime consideration —whether the operation was within the scope of her public duty. In Spivak v. United States, supra [203 F.2d 883], the Court said "What does effectually prevent such recovery is that Spivak in proceeding to the relief of the stranded 'Boutwell' was acting under proper orders of his superiors within the scope of his employment", but the Court had first pointed out that the salvage assignment involved was "within the reasonable range of (the claimant's) position with the War Department", and it seems to me that if this is so it would make little difference whether a claimant does his duty after receiving an express order to do it or because it is his duty. In both cases the policy behind the rule is the same. A case very similar to the present one is The Omaha, D.C., 71 F.Supp. 314, in which the crew of an American naval vessel was awarded salvage in saving a ship of a foreign power not at war with the United States which had been scuttled by its crew.

I, therefore, hold that none of the claimants are barred by reason of their status as public servants.

■ Looting or plundering of the salved vessel by the salvors may be ground for forfeiture of the right to claim salvage. Even such acts on the part of individuals may forfeit the entire claim of all if it appears that the misconduct was so widespread and open that the entire personnel could be charged with responsibility for permitting, concealing or failing to report it. See Danner v. United States, D.C., 99 F.Supp. 880.

■ In the present case there was some evidence in the deposition of the Captain of the Else Basse and in his report to her owners that a number of articles, including belongings of the crew, were missing from the ship upon his return to her on the day after she was brought into port, and it appears that some of the crew's clothing was strewn about in disorder. As to a number of things which Captain Jacobsen spoke of as missing, the testimony does not establish that they were actually on the ship before the fire. It is obvious that if there had been any looting by these claimants, it would have to have been by the crew of the LST. However, in view of the fact that a number of other persons came on board after the ship was anchored and in view of the positive testimony of Captain Barrett, who would necessarily have known of it had it occurred, and of whose truthfulness I have no doubt, I find that the claim that there was looting has not been established.

The next question is as to the amount to be allowed. The catalog of elements to be considered in fixing the amount of salvage, which the Supreme Court furnished in The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870, has been used as a basis for salvage allowance in almost every case since that decision. Running down the list, (1) I should say that the labor expended by the salvors in this case in rendering the salvage service was small in comparison with that in other cases in which substantial salvage has been awarded. (2) The promptitude, skill and energy displayed in rendering the service were of a high order. (3) The value of the property employed by

the salvors and the danger to it do not figure in this award since no claim is being made by the Government, the owner of the vessels involved. (4) The risk incurred by the salvors in securing the property from the impending peril was certainly not great. The tug was supplied with special fire-fighting equipment and it was not necessary for either her or the LST to come close to the burning ship before the fire had been brought under control and very nearly extinguished. Although it had been ascertained that the cargo was not explosive, the boarding parties from the LST and the men from the tug who jumped to the Else Basse incurred risks which puts them, as to this factor, in a class above those who stayed on board their respective vessels —a fact which will be considered in the apportionment of the award. (5) The value of the property rescued. I fix the value of the cargo at $95,324.37. The evidence shows that the ore which constituted the cargo came from a single mine, the entire output of which was contracted to this respondent. No general market for it existed and no market value can be found, but it is reasonable to assume that the price agreed upon represents the actual value. The fact that, due to the peculiar nature of its contract for its purchase, it would have cost the cargo owner more to replace it if it had been lost does not in my view change the value of it when, in fact, it was not lost. (6) The degree of danger from which the property was rescued was high.

■ I award the total sum of $10,100 to the libellants for salvage, bearing in mind that the owner of the vessels is not making any claim and that a very frequent apportionment of salvage award between the owner of the salving vessel and its crew is two-thirds to the former and one-third to the latter. It is also well established that the fact that a party entitled to claim salvage waives his claim does not increase the share to which the others are entitled.

■ In dividing the award among the claimants, I do not think that the division should be made by ships, giving a certain percentage to one vessel and the remainder to the other. We are dealing with the claims of 60 men engaged in a salvage operation, 14 of whom happen to have been on one ship and 46 on another, both ships contributing substantially and almost, if not quite, equally to the success of the operation. The award will be divided per capita upon the merits of the individual services rendered by each man and the risk incurred. On that basis, I make the following award:

To the Masters of the two Government vessels, $400 each.

To the two men from the tug and the four men from the LST who first went aboard the Else Basse in order to secure lines to her, $400 each.

To the eleven men from the LST who remained on board the Else Basse, engaged in extinguishing the fire, $200 each.

To the remaining claimants, $100 each.

■■ An additional allowance should be made to Feleggi who was injured in the course of the salvage operation. However, to award him an amount equivalent to damages which he might recover in a civil action for such an injury would be to ignore the whole theory of the law upon which salvage awards are made. The basic principle is not compensation for loss but a reward or bonus given for successful and meritorious service in saving life or property above and beyond a seaman's ordinary duty. With this in mind, I award Feleggi the sum of $600 in addition to the amount awarded him above.

A decree may be submitted.